## FEDERAL TRADE COMMISSION v. SMITH et al.

District Court, S. D. New York.
Aug. 19, 1932.

248

James T. Clark and J. Butler Walsh, both of Washington D. C. (Robert E. Healy, of Washington, D. C., of counsel), for petitioner.

Simpson, Thacher & Bartlett, of New York City (John W. Davis, John F. Mac-Lane, and Robert H. O'Brien, all of New York City, of counsel), for respondents.

KNOX, District Judge.

The above-entitled proceeding is now before the court for the second time. When previously here, respondent's objections to certain subpœnas duces tecum issued by the Commission were sustained for the reason that, upon the disclosures then made to the court, the process was so all-inclusive in its requirements as to be outside the boundaries

of the Commission's authority, and in violation of respondent's rights and privileges as conferred by the Fourth Amendment to the Federal Constitution. Upon the same occasion, I overruled objections made by respondent to certain questions which counsel for the Commission had propounded to individual witnesses.

The rulings then made were based upon an assumption that Electric Bond & Share Company "as to a part of its business was engaged in interstate commerce."

It was said that: "If respondents wish to contest the propriety of this assumption, the matter will have to go to a master, or, if petitioner wishes an adjudication to the effect that the interstate business of the Electric Bond & Share Company is so intimately associated and connected with interstate commerce that all the company's activities are subject to the jurisdiction of the commission, a reference will be required to establish the fact."

See Federal Trade Commission v. Smith et al. (D. C.) 34 F.(2d) 323.

Thereupon the matter was referred to H. Snowden Marshall, Esq., to take testimony and report upon the interstate feature of the litigation. Before making a report, Mr. Marshall died. The parties subsequently entered into a stipulation of facts which, it has been agreed, shall stand in the place of evidence that might have been adduced before a master. Upon such stipulation, and the conclusions to be drawn therefrom, the court must now render a decision.

At the outset, notice should be taken that petitioner once more urges me to uphold the duces tecum subpœnas heretofore considered. That issue has gone against petitioner, and, whatever inferences are here to be drawn from facts not previously before the court, they cannot retroactively give vigor to process already found to have been without vitality.

In the light of the stipulation of the parties, attention should first be given to the question as to whether the business of Electric Bond & Share Company, or a substantial portion thereof, is of such character as fairly to bring it within the realm of interstate commerce. Such decision as may be rendered will be determinative of the propriety of the assumption in which indulgence was had when the case was first here. It also will serve as a declaration as to the investigatory authority, if any, of the Federal Trade Commission with respect to the affairs of Electric Bond & Share Company.

The stipulation shows the respondent to be a corporation of the state of New York, with its main office within this city. The corporation renders engineering, financial, and advisory services of a technical and specialized character to certain groups of public utility companies and to certain holding companies, which, through stock ownership, control a number of specified public utility companies in the United States, and in foreign countries. Respondent also owns substantial investment interests in stock and other securities of companies controlling through stock ownership certain public utility companies in the United States, and elsewhere. It does not, however, own a majority of the voting stock of any company doing a public utility business in this country, or of any other company which owns securities of any company doing a public utility business in the United States.

As respects the holding companies which enter into the present inquiry, respondent's stock ownership is as follows: American Power & Light Company, 21.73 per cent.; Electric Power & Light Corporation, 13.42 per cent.; Lehigh Power Securities Corporation, 13.25 per cent.; National Power & Light Company, 20.77 per cent.

The corporate enterprises just enumerated hold from a majority to 100 per cent. of the capital stock of sixty-eight subsidiary operating companies. Approximately one-fourth of these companies sell some of their product in interstate commerce.

Both litigants agree that the aforementioned holding companies are nothing more than is implied in the descriptive term applied to them. They do not maintain separate offices; their affairs being carried on by the staff employed by respondent at its headquarters in New York. The corporate officers of the holding companies are largely interlocking.

The subsidiary operating companies have their own official organizations, boards of directors, and executives. In all cases, nevertheless, some of the official staffs of the subsidiaries are likewise officers of Electric Bond & Share Company, and in some instances these latter predominate. An example of the interrelationship existing between the various organizations is to be found in the fact in the years 1926 and 1927 the president of Electric Bond & Share Company was, at the same time, a director of Ameri-

can Power & Light Company, and of seven of its operating subsidiaries; a director of Electric Power & Light Corporation and of two of its subsidiaries; and a director of National Power & Light Company, and of four other companies subsidiary thereto. Similarly, sixteen other officials of respondent were also officers or directors in a great number of the subsidiary holding and operating companies.

The stipulation likewise discloses the fifty largest holders of voting stock in the four holding companies. Among such stockholders are Electric Bond & Share Company, Electric Investors, officers, directors, and employees of respondent, and other individuals closely associated with, or friendly to, that organization.

From what has been made to appear to the court, it is plain that the services performed by respondent on behalf of the holding and subsidiary operating companies, and which, broadly speaking, relate to legal, engineering, secretarial, fiscal, investigatory, and general advisory matters, are not such as will here avail the petitioner. Without analyzing the services rendered by respondent within the foregoing classifications, I shall content myself by concluding that they have to do with activities which, under authoritative decisions, are not recognized as constituting interstate commerce. See Graniteville Manufacturing Company v. Query, 283 U. S. 376, 51 S. Ct. 515, 75 L. Ed. 1126; Hemphill v. Orloff, 277 U. S. 537, 48 S. Ct. 577, 72 L. Ed. 978; Moore v. New York Cotton Exchange, 270 U. S. 593, 46 S. Ct. 367, 70 L. Ed. 750, 45 A. L. R. 1370; Blumenstock Brothers Adv. Agency v. Curtis Publishing Co., 252 U. S. 436, 40 S. Ct. 385, 64 L. Ed. 649; Hall v. Geiger-Jones Co., 242 U. S. 539, 37 S. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643; United States Fidelity & Guaranty Company v. Kentucky, 231 U. S. 394, 34 S. Ct. 122, 58 L. Ed. 283; New York Life Insurance Co. v. Deer Lodge County, 231 U. S. 495, 34 S. Ct. 167, 58 L.-Ed. 332; Engel v. O'Malley, 219 U. S. 128, 31 S. Ct. 190, 55 L. Ed. 128, and Federal Base Ball Club v. National League, 259 U. S. 200, 42 S. Ct. 465, 66 L. Ed. 898, 26 A. L. R. 357.

When, however, the services performed by respondent for its associated and affiliated companies, in certain other capacities are scrutinized, the issue before the court may not be disposed of so summarily.

Attached to the stipulation as one of its exhibits is a contract between respondent and General Electric Company which was in force throughout the years 1926 and 1927, the period with which the present dispute is concerned. It relates to the purchase of electrical apparatus and equipment for use by a group of corporations designated in the contract as "subsidiary companies" of the corporate respondent. This contract first came into existence in 1912. It contains, inter alia, the following provisions:

"That whereas, the General Company is engaged in the manufacture of electrical apparatus and desires to sell, subject to the terms and conditions hereof, *to the Bond and Share Company, and to the companies listed in Schedule attached* (hereinafter called Subsidiary Companies), which are engaged in the business of central station electric lighting or distributing electric power for other purposes, for its use and the use of the Subsidiary Companies, the apparatus manufactured by the General Company for central station lighting or for other purposes and the Bond and Share Company and said Subsidiary Companies are willing to buy such apparatus required by them from the General Company.

"Now, Therefore, in consideration of the premises and other covenants hereinafter contained, it is agreed as follows:

"First: The General Company agrees to furnish to *the Bond and Share Company and to the Subsidiary Companies,* for use only of said companies, electrical apparatus and supplies, including steam turbines and adjuncts thereto, and including turbine or motor-driven centrifugal exhausters and compressors, manufactured by the General Company (but excluding incandescent lamps), required by the Bond and Share Company and the Subsidiary Companies for its and their business of central station lighting or for other purposes for cash or on such other terms as may be agreed upon at the lowest current prices to its most favored customers purchasing in like quantities and under similar conditions. The prices, terms and other conditions applying to various classes of supplies furnished by the General Company under this agreement, shall be as set forth in the riders, schedules or subsidiary agreements which are or which shall hereafter be attached to and made a part of this agreement.

"Second: The Bond and Share Company agrees *to cause to be purchased* from the General Company such electrical apparatus, supplies and turbines required by it or by the Subsidiary Companies in its or their

business of Central Station lighting or for other purposes. * * *

"Sixth: It is further agreed that the terms of this agreement and of the riders, schedules or subsidiary agreements which are, or which shall hereafter, be attached to or made a part of this agreement, shall apply to all companies not enumerated in attached schedule in which the Bond and Share Company shall obtain ownership or a controlling or operating interest (providing the General Company shall be free to sell to such company); and the Bond and Share Company agrees to promptly notify the General Company *in case they acquire ownership or a controlling or operating interest in any company not enumerated* in attached Schedule.

"It is also agreed that *if at any time by reason of change in interest, ownership or control, the Bond and Share Company shall be unable to control the purchase of equipment by any of the Subsidiary Companies, due notice* shall be given the General Company and this agreement shall no longer be applicable to said subsidiary company." (Italics mine.)

From time to time reprints of the agreement, carrying supplements containing the names of corporations entitled to the benefits of the contract, together with revisions of the lists of apparatus covered thereby, were furnished to Electric Bond & Share Company. The exhibit also includes "a supplementary agreement covering construction work" between respondent and General Electric Company. This latter document bears date of January 1, 1924, and was in force during 1926 and 1927, but it is of slight importance to the controversy, save to indicate that General Electric, if required, will furnish certain classes of workmen to respondent and its subsidiaries, at stipulated rates.

The purchase contract provided for the allowance of quantity discounts on the aggregate of all purchases as should be made thereunder. At the close of a specified contract period, checks for such discounts as had accrued under the agreement, and which had not previously been allowed, drawn to the order of the companies for whose accounts apparatus or material had been purchased, and proportionate thereto, would be forwarded by General Electric Company to respondent. The latter in due course would forward the checks to the payees named therein, respectively, and retained for itself no portion of the discounts.

In passing, it may be noted that, although American Gas & Electric Company, and its subsidiaries, are scheduled in the purchase agreement as entitled to its benefits, respondent did no purchasing for that holding company, or its subsidiaries during the years mentioned. As to them, therefore, respondent had no discount checks to distribute.

As construed by the parties to the agreement, the discounts were to be allowed on an "if, as and when" purchase basis, and the contract imposed no obligation on respondent that purchases should be made from General Electric Company, in preference to other manufacturers of electrical apparatus and equipment. As a matter of fact, a similar purchasing arrangement, not in writing, was in force with Westinghouse Electric & Manufacturing Company during the years 1926 and 1927, and this was known to General Electric Company.

Notwithstanding, most of the purchases (in some classes of apparatus more than 90 per cent.) were made from General Electric Company.

At this point, mention must be made of the Phœnix Utility Company. All of its capital stock is owned by respondent, and its general (New York) office is manned entirely by officers and employees of respondent. This concern, acting on the requisition of the operating companies, made in pursuance of the terms of supervisory agreements with respondent, purchased apparatus within the years 1926 and 1927 of an aggregate value of more than $5,000,000. This sum does not include the value of purchases made in connection with certain agreements of the operating companies relating to construction work. Purchase of this class of supplies, which were made by Phœnix Utility Company, on behalf of the operating companies, had a value of something like $23,000,000. In practice, purchase orders of the subsidiaries were signed by the Phœnix Utility Company as "Purchasing Agent" for the company that was to have the apparatus or material covered by the order. Shipments under such orders were made by the manufacturer or distributer of the apparatus or supplies direct to the company that was to use the same.

Most of the purchases made as aforesaid moved in interstate commerce.

Payment for material and supplies thus obtained by the operating companies was made by them either from their funds in

New York banks, or at their local places of business, as bills were rendered. Such payments as were remitted from the New York office were made by check of the operating companies drawn on a New York bank, signed by officers of the operating companies who also were officers or directors of respondent.

Bills for construction apparatus or material were sent, in ordinary course, to the field office of Phœnix Utility Company, and were paid at such office from funds then or theretofore supplied by the operating company.

Substantially all fees for services rendered by Phœnix Utility Company were paid to Electric Bond & Share Company.

As illustrative of the extent of the company's activities, and the manner in which they were carried out, I quote a number of clauses taken from its contracts with the subsidiary holding companies which, it will be remembered, control the operating units. In its contract with American Power & Light Company, the Electric Bond & Share Company states:

"C. *Supervision of Operation of Subsidiaries:* We propose to furnish, at our expense, the services of our Operating Department, in charge of one of our Vice-Presidents, including—

"1. A 'Sponsor' who will be one of our operating specialists, who shall be known as 'sponsor for ——— group, American Power and Light Company properties.'
* * *

"4. Purchasing Department, which will assist in the purchase of apparatus and material, and the routing and tracing of shipments. The subsidiaries will be included in the *large general purchase contracts made by us* for lamps, transformers, meters, etc., whereby, through the large volume of purchases, lower prices are secured." (Italics mine.) Exhibit M, pp. 3, 4.

The contract with the Electric Power & Light Corporation contains the following provisions:

"20. We will serve your company in matters pertaining to purchasing and, where purchases can be made more advantageously by us than by your organization, we will conduct such purchases and fulfill all functions of a purchasing organization in so far as can be done in our New York office. For purchasing in connection with construction work, see Section 28.

"We maintain an information service through which we will transmit to your company information in regard to market conditions and other matters pertaining to purchasing.

"21. We regularly negotiate and place blanket contracts and orders for equipment, material, supplies, etc., generally used by public utilities, and the requirements of your company will be included therein, thereby gaining for you the benefits of favorable discount, prices and deliveries obtainable through large combined purchases and close contact with market conditions.
* * *

"23. We will serve your company in matters pertaining to transportation of materials and supplies, and will route and classify shipments supplied against contracts or purchase orders placed for it. We will furnish information concerning classification and routing of commodities, insurance in transit, freight rates, proper procedure in the filing of freight claims and the checking and auditing of transportation invoices," etc.

"28. We will, when authorized by separate agreement, procure ——— or other responsible contractor to do for your company construction or reconstruction work of any character or magnitude. So long as a construction organization is continuously maintained by such contractor on your property, new jobs may be added to existing contract as supplementary to it. Whenever the construction organization has, in its entirety, been withdrawn from your property, any work requiring its return must be covered by a new contract.

"The services which will be performed in connection with such work will include organization and direction of the construction operations, field engineering, purchasing materials and equipment, obtaining construction superintendents, assembling the necessary construction forces and construction plant, keeping proper records and books of account and all other things necessary or incidental to consummation of the work."

Similar provisions are to be found in the agreement with the National Power & Light Company, and in the general form of service contract set forth in Exhibit 4001.

The foregoing recital engenders an insistent thought that, through the interlocking relationship of the several corporations concerned, the Electric Bond & Share Company had much to do with the determination

by its denominated subsidiaries as to when and where they should purchase apparatus, materials, and supplies which were required in carrying on their respective businesses, and also that, in what was done, the parent company acted in other than a purely brokerage capacity. The phraseology of the contract with General Electric Company gives apparent recognition to the compulsory character of such influence as Electric Bond & Share Company chose to exercise over the affairs of the subsidiaries. Under the guise of supervisory and advisory services, the parent concern was afforded an opportunity actively to promote purchases from General Electric Company. That it did so in great volume is obvious. Not only did it charge a fee for advisory and supervisory services performed on behalf of the subsidiaries, but, through the medium of its stock ownership, it became a beneficiary of such profits as accrued to the subsidiaries as a result of the purchases.

The contract with General Electric Company, it should be noted, contained this paragraph: "If * * * the Bond and Share Company shall be unable to control the purchase of equipment by any of the Subsidiary Companies due notice shall be given the General Company and this agreement shall no longer be applicable to said subsidiary company."

Words such as "control" and "Subsidiary Companies" and the phrase "cause to be purchased," which also appears in another portion of the agreement, when used in any contract usually carry implications that are definite and easy to understand. In this instance, such implications gather emphasis from the corporate relationship existing between Electric Bond & Share Company and its subsidiaries. The extent to which purchases were made, pursuant to the contract, together with the detail of their execution and shipment, tend to demonstrate that, in handling transactions of great volume and high value, Electric Bond & Share Company was a ruling agent and actively participated in the interstate movement of commerce.

But, irrespective of all that has been said, Electric Bond & Share Company insists that it is outside any and all jurisdiction of the Federal Trade Commission. In this, is the company right or wrong? If realities, rather than artificialities, are determinative of the question, it is my belief that the company is wrong.

An examination of the decisions of the Supreme Court of the United States, dealing with the extent of the power of Congress over commerce among the states, discloses the error under which respondent labors.

In Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 42 S. Ct. 106, 66 L. Ed. 239, a Tennessee corporation, pursuant to its practice of purchasing grain in Kentucky to be transported to and used in its Tennessee mill, made a contract for the purchase of wheat, to be delivered in Kentucky on the cars of a public carrier, intending to forward it to the Tennessee destination as soon as delivery was made. The court held the transaction to be interstate in character, notwithstanding the contract was made and to be performed in its entirety in Kentucky, and that the possibility of a change of intention on the part of the purchaser with a consequent sale and consignment of the grain within the state of Kentucky would not affect the essential character of the transaction. In speaking of the scope of interstate commerce, the court said at page 290 of 257 U. S., 42 S. Ct. 106, 108: "Such commerce is not confined to transportation from one state to another, but comprehends all commercial intercourse between different states and all the component parts of that intercourse. Where goods in one state are transported into another for purposes of sale, the commerce does not end with the transportation, but embraces as well the sale of the goods after they reach their destination and while they are in the original packages. Brown v. Maryland, 12 Wheat. 419, 446–447, 6 L. Ed. 678; American Steel & Wire Co. v. Speed, 192 U. S. 500, 519, 24 S. Ct. 365, 48 L. Ed. 538. On the same principle, where goods are purchased in one state for transportation to another, the commerce includes the purchase quite as much as it does the transportation. American Express Co. v. Iowa, 196 U. S. 133, 143, 25 S. Ct. 182, 49 L. Ed. 417."

In Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458, a North Dakota association, in the usual course of trade, bought grain in that state, placed it on its elevator, loaded it promptly on cars, and shipped it to other states for sale. The grain even after loading was subject to be diverted and sold locally if the price was offered; but local sales were unusual, the company's entire market, practically, being outside North Dakota. It was held that the business, including the buying of grain in North Dakota, was interstate commerce, and that, as applied to this business, a North Dakota statute requiring purchasers of grain

to pay a license fee and to act under a defined system of grading, inspection, and weighing, and subjecting the prices paid and profits made to regulation, was a direct burden on interstate commerce. In Shafer v. Farmers' Grain Co., 268 U. S. 189, 45 S. Ct. 481, 69 L. Ed. 909, a later statute of North Dakota having the same general purpose was held invalid as applied to the same association.

The foregoing cases, it will be noted, all involved *purchasers* who bought goods in sales that were completely consummated within a single state. If, as a practical matter, the Electric Bond & Share Company be regarded as controlling purchases made under the contract with the General Electric Company (and it agreed therein "to cause (apparatus, supplies and turbines) to be purchased"), a conclusion that it is engaged in interstate commerce is irresistible.

And, indeed, if respondent be regarded as the broker or agent, and if, in connection with such engagement, one of its functions was to arrange for the interstate shipment of supplies to the operating companies, it would thereby also be engaged in interstate commerce.

In Di Santo v. Com. of Pennsylvania, 273 U. S. 34, 47 S. Ct. 267, 71 L. Ed. 524, plaintiff was authorized by four steamship companies to sell tickets and orders for transportation entitling persons to passage to and from foreign countries, and to collect money for the tickets and orders sold. He was required to give bonds to the respective companies and to account for moneys received for the tickets, less a percentage for his remuneration. It was decided that the plaintiff was engaged in foreign commerce, and that, consequently, a state statute was invalid which required such ticket agents, other than railroad and steamship companies, to procure a license, pay a fee, and file a bond as security against fraud. The court predicated its holding upon Texas Transport & Terminal Co. v. New Orleans, 264 U. S. 150, 44 S. Ct. 242, 68 L. Ed. 611, 34 A. L. R. 907, and McCall v. California, 136 U. S. 104, 10 S. Ct. 881, 34 L. Ed. 392. In the first of these two adjudications, it was held that a state license tax could not be laid upon the business of a corporation which acted as agent for the owners of vessels engaged in interstate and foreign commerce, in soliciting and engaging cargo, arranging for delivery on wharf and for stevedores, issuing bills of lading, collecting freight charges, and performing other incidental services. In the latter case, plaintiff acted as an agent in San Francisco for the New York, Lake Erie & Western Railroad Company, which operated a continuous line of road from Chicago to New York. His only duty was to induce people to take that route, if they were taking a trip east from Chicago. He did not sell any tickets for that route. Nevertheless, he was declared to be engaged in interstate commerce, and it was accordingly held that a municipal license tax for the privilege of doing business in San Francisco was unconstitutional as applied to him.

At this point, note should be taken of the fact that, in the cases just discussed, the Congress had not specifically undertaken to exercise supervision or control over the matters which were there under review. Nevertheless, the Supreme Court believed them to be within the protection of the commerce clause of the Constitution (article 1, § 8, cl. 3). In the case at bar, the Congress has taken a step of affirmative character, even though it has not yet chosen definitely to regulate holding companies which, through intercorporate networks, control the destinies of subsidiary operating companies doing interstate business. In other words, it has enacted section 6 (a) of the Federal Trade Commission Act (15 USCA § 46 (a). Unequivocally, the Federal Trade Commission was vested with power "to gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any corporation engaged in commerce, excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other corporations and to individuals, associations, and partnerships."

This enactment, at the very least, requires a conclusion that a corporation, whose activities are such as to give it the protection of the commerce clause under the decisions set forth above, should not be held to be beyond the reach of the Commission's authority.

Decisions of the courts upholding various state taxes, and others of a cognate nature, which are called to my attention in support of respondent's contention that Electric Bond & Share Company is not engaged in interstate commerce, do not rule the question here presented. Most, if not all of them, depended upon factors far more complex than a finding as to whether a particular corporation, in the light of definite evidence, is

engaged in interstate commerce. The question of the propriety of allowing a state to regulate a particular business in the absence of a regulation by Congress; of whether a particular regulation by Congress is a prohibition to the states; of how much, in fact, was regulated; of the actual economic effect of a tax—all these factors, and many more, were under consideration by the courts in the cases cited by respondent, in their endeavor to delineate the some time shadowy boundary between permissible state and federal action.

But this case presents no such problem. A decision by this court that Electric Bond & Share Company is engaged in interstate commerce, so as to subject it to the investigatory power of the Federal Trade Commission, carries with it no concomitant denial of regulatory or taxing power upon the part of a state sovereignty.

This circumstance, when considered in connection with the decisions showing how much has been held to be included within the domain of interstate commerce, tends to clarify my conviction that Electric Bond & Share Company is "engaged in commerce" within the meaning of the Federal Trade Commission Act.

█ But, say respondents, since the jurisdiction of the Commission is limited to interstate commerce, the intrastate business and affairs of Electric Bond & Share Company are outside of the Commission's authority, even though concession should be made that the company, as to some matters, engaged in interstate trade. If intrastate trade could definitely be separated from that which is interstate, I should agree. For example, if the company charged its subsidiaries a specified fee for services rendered in connection with the purchase of apparatus and materials, it might well be that the investigation of the Commission should be limited to inquiries relevant to the reasonableness of such charges as were made upon this account. Such, however, is not the method of operation. The parent company makes a blanket charge for substantially all of its services, and this is based upon certain percentages of the gross earnings of the subsidiaries. The reasonableness of this charge cannot be ascertained merely by inquiring into the cost of rendering the purchasing services. The cost of rendering other services for which a fee is charged must also be determined, because they are inextricably involved with the cost of work having to do with interstate activity. The Commission's jurisdiction

must extend, therefore, to all services for which a fee covering an interstate activity is charged. See Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S. 194, 32 S. Ct. 436, 56 L. Ed. 729.

█ Lest it be forgotten, it is well to remind one's self that approximately one-fourth of the operating subsidiaries are partly engaged in interstate commerce in the sale or distribution of electricity or gas. That the interstate transmission of electrical power is interstate commerce is settled beyond doubt. Public Utilities Commission v. Attleboro Steam & Electric Co., 273 U. S. 83, 47 S. Ct. 294, 71 L. Ed. 549. Although the interstate business of some of these subsidiaries is small, it comprises a substantial portion of the business of others. Rates charged for this power are unquestionably within the regulatory power of Congress. The fairness and reasonableness of rates in large measure depend upon the cost of furnishing the services. One of the costs of the operating subsidiaries is the charge which it pays to Electric Bond & Share Company. As to the pertinency of this factor, recourse may be had to the decision of the Supreme Court in Smith v. Illinois Bell Telephone Co., 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255. Under that authority, the cost of the services which Electric Bond & Share Company renders its operating subsidiaries, and for which it charges them a fee, is relevant to an investigation into the fairness of the rates charged by these companies for power transmitted across state lines. See, also, Western Distribution Company v. Public Service Commission of Kansas, 285 U. S. 119, 52 S. Ct. 283, 76 L. Ed. 655.

As bearing upon the practical control of the subsidiary corporations by the parent concern, even though it does not hold a majority stock interest in the four subsidiary holding companies, attention is directed to Delaware & Hudson Co. v. Albany & Susquehanna R. Co., 213 U. S. 435, 29 S. Ct. 540, 53 L. Ed. 862, and United States v. Union Pacific R. Co., 226 U. S. 61, 33 S. Ct. 53, 57 L. Ed. 124.

Upon the basis of the control which respondent exercises over its subsidiary companies through such minority stock interests, as well as through the presence of many of its officers and directors upon the boards of officers and directors of the subsidiary companies, and in view of the character of the services rendered pursuant to the service contracts, petitioner asks me to disregard the corporate identities of the sub

sidiary companies, and to hold that "as the acts of the Electric Bond and Share Company are the acts of these operating companies, the former is engaged in interstate commerce to the extent that the operating companies are so engaged."

In consideration of what has heretofore been said, I am of opinion that there is no need to go to the lengths asked by the Commission.

By virtue of the control which respondent exercised over the subsidiary operating companies, it had a direct effect upon all their business, including that in interstate commerce. The power of the national government over interstate commerce has been held to extend not only to activities which may be formally denominated subjects of interstate commerce, but to acts which in fact affect that commerce. See Di Santo v. Com. of Pennsylvania, supra. Compare also the following cases: Western Union Telegraph Co. v. State of Kansas, 216 U. S. 1, 30 S. Ct. 190, 54 L. Ed. 355, where a state tax upon the privilege of doing local business was held unconstitutional because its effect was to burden interstate commerce; The Daniel Ball, 10 Wall. (77 U. S.) 557, 19 L. Ed. 999, where the federal license and inspection laws were held applicable to a vessel engaged in transportation entirely within one state, because the vessel carried goods bound for another state; Southern R. Co. v. United States, 222 U. S. 20, 32 S. Ct. 2, 56 L. Ed. 72, where the Federal Safety Appliance Acts (45 USCA § 1 et seq.) were held applicable to cars moving in intrastate traffic and not connected with any cars used in interstate commerce, on the ground that such regulation promoted the safety of those engaged in interstate commerce; Southern Pacific Co. v. Industrial Accident Commission, 251 U. S. 259, 40 S. Ct. 130, 64 L. Ed. 258, 10 A. L. R. 1181, where a lineman wiping insulators supporting a main wire conducting electricity which, flowing from it through a transformer, and thence along the trolley wires of a railroad, moved cars in both interstate and intrastate commerce, was held employed in interstate commerce, within the Federal Employers' Liability Act (45 USCA §§ 51-59).

It follows that the commerce power, in the exercise of which Congress enacted the Federal Trade Commission Act, is indubitably broad enough to comprehend the acts of respondent which have been shown to affect interstate commerce, and, in the light of the foregoing decisions, it would seem clear that respondent is "engaged in commerce" within the meaning of that act.

The manner in which the affairs of the operating companies having to do with interstate commerce are affected by Electric Bond & Share Company, as well as its own activities in the purchase and shipment of materials and equipment in interstate commerce, are quite sufficient to bring respondent within the investigatory authority of the Federal Trade Commission.

Accordingly, an order will be entered directing the individual respondents to answer all questions relating to the cost to Electric Bond & Share Company of such services as it renders the operating companies in return for the payment of a fee based upon their gross earnings; to the cost of rendering purchasing services which result in interstate movements of materials, apparatus, and supplies to or from any of its subsidiaries, for which a separate fee is charged; and to the cost of rendering any services to subsidiary companies engaged in the interstate transmission of electricity or gas, for which a separate fee is charged.