SECURITIES AND EXCHANGE COMMISSION v. ELECTRIC BOND & SHARE CO. et al. (POWER SECURITIES CORPORATION et al., Interveners).

District Court, S. D. New York.

Jan. 29, 1937.

Counsel, Securities and Exchange Commission, of Washington, D. C., and Benjamin V. Cohen and Thomas G. Corcoran, Sp. Assts. to Atty. Gen. (David Cobb, Joseph P. Cotton, Jr., of New York City, and Joseph Fanelli, Henry H. Fowler, Henry A. Herman, Norman L. Meyers, Malcolm Monroe, Nathaniel L. Nathanson, and Joseph L. Rauh, Jr., all of Washington, D. C., of counsel), for plaintiff.

Simpson, Thacher & Bartlett, of New York City (Thomas D. Thacher, John F. MacLane, Douglas A. Calkins, Walter E. Beer, Jr., and Richard H. Demuth, all of New York City, of counsel), for all defendants and intervening defendants.

Reid & Murphy and A. J. G. Priest, all of New York City (M. F. Millikan, of New York City, of counsel), for certain defendants.

MACK, Circuit Judge.

This is a suit in equity brought by Securities and Exchange Commission against Electric Bond & Share Company and certain subsidiaries, based upon the Public Utility Holding Company Act of 1935.[1] It seeks to enjoin defendants from violating any provision of section 4 (a) of the act (15 U.S.C.A. § 79d (a) unless they register pursuant to section 5 thereof (15 U.S.C.A. § 79e). While admitting in their answer that they come within the terms of these sections, are doing the acts thereby prohibited to an unregistered company, have not registered, and do not intend voluntarily so to do, defendants attack the constitutionality of the act and of each section thereof. By cross-bill with added cross-defendants, an injunction against the enforcement of the act is sought on like grounds of its unconstitutionality; furthermore, a declaratory judgment is asked for under the Federal Declaratory Judgment Act of 1934 (Jud. Code, § 274d, as amended, 28 U.S.C.A. § 400) of the constitutionality of the act and of each section thereof. Cross-defendants move for the dismissal of the cross-bill.

The action was originally brought against Electric Bond & Share Company (hereinafter called Bond & Share) and five of its intermediary holding companies, American Gas & Electric Company (American Gas), American Power & Light Company (American Company), Electric Power & Light Corporation (Electric Company), National Power & Light Company

John J. Burns, Gen. Counsel, Securities and Exchange Commission, of Washington, D. C., Robert H. Jackson, Asst. Atty. Gen., and Sp. Counsel, Securities and Exchange Commission, John J. Abt, Sp.

---

[1] Hereinafter called the act. 49 Stat. 838, 15 U.S.C.A. § 79 et seq.

(National Company), and United Gas Corporation (United Company). These are all immediate subsidiaries of Bond & Share, with the exception of United Company, 7.18 per cent. of whose stock is owned by Bond & Share; but United Company is a subsidiary of Electric Company. Subsequently, leave was given to sixteen other holding companies in the Bond & Share system to 'intervene as defendants; seven were exempted from all duties and liabilities under the act as holding companies, pursuant to a rule of the commission, and two have ceased to be holding companies, by reason of their acquisition of all of the properties of their subsidiaries. Thus there remain in addition to the original six the following seven defendants, Power Securities Corporation (Power Company), a subsidiary of Electric Company, Lehigh Power Securities Corporation (Lehigh Company), a subsidiary of National Company, Utah Power & Light Company, a subsidiary of Electric Company, United Gas Public Service Company, a subsidiary of United Company, Houston Gulf Gas Company, a subsidiary of United Gas Public Service Company, Nebraska Power Company, a subsidiary of American Company, and Pacific Power & Light Company, a subsidiary of American Company. These last five named defendants are both operating and holding companies.

The cross-defendants who by stipulation were brought in, personally as well as in their official capacities, are Homer S. Cummings, Attorney General of the United States, James M. Landis, Robert E. Healy, George C. Mathews, and James D. Ross, members of the Securities and Exchange Commission, and James A. Farley, Postmaster General.

The facts in the case have been stipulated; where conclusions of fact have not been agreed upon, sufficient facts have been stipulated, wherever material, for the court to draw its own conclusions.

A brief statement of parts of the act will be helpful. Section 1 (15 U.S.C.A. § 79a) sets out the legislative findings upon which the stated policy of the act and the need for federal regulation of holding companies were based; it recites the uses made by them and their subsidiaries of the mails and the means and instrumentalities of interstate commerce, the abuses of holding company operations, and their effect on the interests of investors and consumers.

Section 2 (15 U.S.C.A. § 79b) defines the terms used in the act. Thereunder, "public utility company" is an electric utility company or a gas utility company. "Electric utility company," a company which owns or operates facilities used for the generation, transmission, or distribution of electric energy for sale. "Gas utility company," a company which owns or operates facilities used for the distribution at retail of natural or manufactured gas for heat, light, or power. "Holding Company" is defined as a company which owns, controls, or holds, with power to vote, 10 per cent. or more of the outstanding voting securities of a public utility company or holding company. Such a company may be declared not to be a holding company on a showing to the commission that it does not control and is not a device for controlling a public utility company or holding company. "Subsidiary company" of a holding company is a company, 10 per cent. or more of the outstanding voting securities of which are owned, controlled, or held with power to vote by that holding company or by a company which is a subsidiary of that holding company. "Holding-company system" is defined as a holding company together with all of its subsidiaries. Various exceptions and qualifications not here material are made relating to these and other definitions.

Section 3 (15 U.S.C.A. § 79c) specifies classes of holding companies which, with their subsidiaries, the commission is directed to exempt from the provisions of the act "unless and except insofar as it finds the exemption detrimental to the public interest or the interest of investors or consumers." Among these are holding companies with their subsidiaries, which are predominantly intrastate in character and confined to the one state in which all are organized.

Section 4 (a), 15 U.S.C.A. § 79d (a),[2] prohibits holding companies, unless registered under section 5 (15 U.S.C.A. § 79e) from making specified uses of the mails and instrumentalities of interstate commerce and from owning, controlling, or holding with power to vote any security of any subsidiary that does any of the specified forbidden acts. Plaintiff does not rely on section 4 (b), 15 U.S.C.A. § 79d (b),

[2] The provisions of section 4(a) are more fully stated in a later part of the opinion.

that requires any holding company which has publicly distributed by means of the mails or the channels of interstate commerce an issue of securities subsequent to January 1, 1925, to register under section 5 (15 U.S.C.A. § 79e) if such securities are still outstanding among investors in the several states.

Section 5 (a), 15 U.S.C.A. § 79e (a),[3] provides for registration by holding companies by a form of notification to the commission, and section 5 (b, c, d), 15 U. S.C.A. § 79e (b, c, d),[3] provides for the filing by registered companies of registration statements containing information concerning their capitalization, business, and relations with subsidiaries.

The other sections of the act apply in the main only to registered companies and their subsidiaries. Sections 6 and 7 (15 U.S.C.A. §§ 79f, 79g) provide for the regulation of the issuance and sale of securities of registered companies and the altering of the rights of holders of their outstanding securities. Sections 8, 9, and 10 (15 U.S.C.A. §§ 79h, 79i, 79j) deal with the regulation of the acquisition by registered companies or their subsidiaries of utilities and security assets. Section 11 (15 U.S.C.A. § 79k) provides for the simplification of registered holding company systems by the elimination after a certain date of holding companies above the second degree, and the requirement that each

---

[3] "Sec. 5 (a) On or at any time after October 1, 1935, any holding company * * * may register by filing with the Commission a notification of registration, in such form as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers. * * *

"(b) It shall be the duty of every registered holding company to file with the Commission, within such reasonable time after registration as the Commission shall fix * * * a registration statement * * * [which] shall include—

"(1) * * * copies of the charter * * * partnership, or agreement, * * * and the by laws, trust indentures, mortgages, underwriting arrangements, voting-trust agreements, and similar documents, * * * relating to the registrant or any of its associate companies * * * prescribe[d] as necessary or appropriate in the public interest or for the protection of investors or consumers;

"(2) such information * * * and copies of such documents * * * relating to, the registrant and its associate companies as the Commission may * * * prescribe as * * * appropriate in the public interest or for the protection of investors or consumers in respect of—

"(A) the organization * * * financial structure * * * and the nature of their business;

"(B) the * * * rights, * * * of the different classes of their securities outstanding;

"(C) the terms and underwriting arrangements under which their securities, during not more than the five preceding years, have been offered to the public or otherwise disposed of and the relations of underwriters to, and their interest in, such companies;

"(D) the directors and officers * * * their remuneration, their interest in the securities of, their material contracts with, and their borrowings from, any of such companies;

"(E) bonus and profit-sharing arrangements;

"(F) material contracts, not made in the ordinary course of business, and service, sales, and construction contracts;

"(G) options in respect of securities;

"(H) balance sheets for not more than the five preceding fiscal years, certified, if required * * * by an independent public accountant;

"(I) profit and loss statements for not more than the five preceding fiscal years, certified, if required * * * by an independent public accountant;

"(3) such further information or documents regarding the registrant or its associate companies or the relations between them as the Commission may by rules and regulations or order prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers.

"(c) The Commission * * * may permit a registrant to file a preliminary registration statement without complying with the provisions of subsection (b); but every registrant shall file a complete registration statement * * * within such reasonable period of time as the Commission shall fix * * * not later than one year after the date of registration.

"(d) Whenever the Commission, upon application, finds that a registered holding company has ceased to be a holding company, it shall so declare by order and upon the taking effect of such order the registration of such company shall, * * * cease to be in effect. The denial of any such application by the Commission shall be by order."

holding company system limit its operation to a single integrated public utility system, with various exceptions and limitations. Sections 12 and 13 (15 U.S.C.A. §§ 79*l*, 79m) provide for the regulation of intercompany transactions and service, sales, and construction contracts. In the administration of all of these provisions, the commission plays a large part through the requirement of the issuance of rules, and the conduct of administrative hearings. The other provisions of the act are for the most part regulations designed to facilitate the administration of the act in general, such as the keeping of records by registered companies, penalties for violations of the act, and various provisions for the enforcement of the act by the commission.

The first question for determination is whether, as plaintiff contends, the registration provisions, sections 4 (a) and 5 (15 U.S.C.A. §§ 79d (a), 79e), if inherently constitutional, may stand, regardless of the constitutionality of the other sections of the act, including the so-called "death sentence;" section 11 (15 U.S.C.A. § 79k), thus obviating any consideration of the constitutionality of such other sections, so far as the bill and answer are concerned.

Defendants urge that the validity of the whole act must be determined before they may be enjoined from doing any of the acts enumerated in section 4 (a), or, practically speaking, before they may be compelled to register, for the alleged reason that the scheme of the act is such that it forms an inseparable whole. Plaintiff contends, on the other hand, that the act indicates a clear line of demarcation between the obligations imposed upon an unregistered and those laid upon a registered company; that as to the former, the duty is solely to comply with sections 4 (a) and 5, that is, to register and to give certain information. Therefore, by the bill it seeks to put in issue the validity of the registration provisions alone, that is, sections 4 (a) and 5; it does not aim thereby to compel compliance with any other provision of the act, applicable only to registered companies and from which, it asserts, the registration sections are separable.

Furthermore, plaintiff urges that notwithstanding registration, defendants would not be deprived of the right to contest the validity of the other provisions of the act. See In re American States Pub. Serv. Co. (D.C.Md.1935) 12 F.Supp. 667, 689; Burco, Inc., v. Whitworth (C.C.A.4th, 1936) 81 F. (2d) 721, certiorari denied (1936) 297 U.S. 724, 56 S.Ct. 670, 80 L.Ed. 1008. Any doubt as to this is clearly dispelled by a rule of the commission, issued pursuant to its rule-making power under the act, which permits registration with an express reservation of any constitutional or legal rights and further provides that if such reservation shall be judicially adjudged invalid, the registration shall be voidable at the option of the registrant. Public Utility Investing Corp. v. Utilities Power & Light Corp. (C.C.A.4th, 1936) 82 F.(2d) 21.

The effect of the separability clause of the act, section 32 (15 U.S.C.A. § 79z—6),[4] is to create a presumption of separability. "That is to say, we begin, in the light of the declaration, with the presumption that the Legislature intended the act to be divisible, and this presumption must be overcome by considerations which make evident the inseparability of its provisions or the clear probability that the invalid part being eliminated the Legislature would not have been satisfied with what remains." Williams v. Standard Oil Co. (1929) 278 U.S. 235, 242, 49 S.Ct. 115, 117, 73 L.Ed. 287, 60 A.L.R. 596. See, also, Utah Power & Light Co. v. Pfost (1932) 286 U.S. 165, 184, 52 S.Ct. 548, 553, 76 L.Ed. 1038; Champlin Refining Co. v. Corporation Commission (1932) 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062, 86 A.L.R. 403. Accordingly, this presumption of the separability of the registration provisions is rebuttable in two ways: first, by a showing that standing alone, the provisions do not constitute a workable law to which legal effect can be given, and, second, by evidence of a clear probability that Congress did not intend them to stand if others should be held to fall for invalidity. Dorchy v. State of Kansas (1924) 264 U.S. 286, 44 S.Ct. 323, 68 L.Ed. 686; Champlin Refining Co. v. Corporation Commission, supra; cf. Lynch v. United States (1934) 292 U.S. 571, 54 S. Ct. 840, 78 L.Ed. 1434. "Our right to de-

---

[4] "Sec. 32. If any provision of this title [chapter] or the application of such provision to any person or circumstances shall be held invalid, the remainder of the title [chapter] and the application of such provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby."

stroy is bounded by the limits of necessity. Our duty is to save, unless in saving we pervert. When all the world can see what sensible legislators in such a contingency would wish that we should do, we are not to close our eyes as judges to what we must perceive as men. This need is all the greater in fields where the law is in a stage of transition and readjustment." People ex rel. Alpha Portland Cement Co. v. Knapp (1920) 230 N.Y. 48, 62, 63, 129 N.E. 202, 208, per Cardozo, J.

It seems clear, and indeed does not appear seriously to be contested, that the registration provisions in and of themselves could constitute a workable regulatory device through the publicity that may be given to the extensive information which registered holding companies must file pursuant to section 5 (15 U.S.C.A. § 79e), especially when supplemented by the periodic reports, pursuant to sections 13 (g) and 14 (15 U.S.C.A. §§ 79m (g), 79n). See 30 Ill.Law Rev. 648, 657 (Jan., 1936). The mere statement of some of the evil practices engaged in by some public utility holding companies, as found by the Federal Trade Commission in its investigation,[5] upon which, in part, the act is recited to be based, suffices to demonstrate that publicity of that financial information which is now seldom made public will tend to mitigate and perhaps to eliminate at least some of those abuses. Students of public utility holding company regulation have recognized that enforced publicity would materially aid as a corrective measure in eliminating abuses. See Bonbright, The Evils of the Holding Company, in The Annals (Jan. 1932) 1, 3; Mosher, Electrical Utilities (1929) 102, 124.

Some of the evils recited in the Federal Trade Commission Report are:

"Loading the fixed capital account of public utilities with arbitrary or imaginary amounts in order to establish a base for excessive rates.

"Writing up the fixed assets without regard to the cost thereof, with the result of watering the stock or creating a fictitious surplus. •

"Engaging in transactions of purchase and sale of property or securities with controlled or subsidiary companies for the purpose of recording arbitrary profits or fixing valuations unjustified by market values.

"Exaction of payments from affiliated or controlled companies for services in excess of cost or value of such services.

"Misstatement of earned surplus, or failure to distinguish earned from capital surplus, and making payment of dividends from the latter.

"Deceptive or illusory methods of dividing, or pretending to divide earnings or profits.

"Issuing special voting or management stock giving control at small cost in order to promote the interests of selfish cliques, against the interest and safety of the general stockholders.

"Intercompany financing on a basis disadvantageous to operating company borrowers or lenders."

The information required to be filed in the registration statement will also be of value to investors whose interests are specifically recognized in section 22 (a), 15 U.S.C.A. § 79v (a),[6] in appraising the value of securities of holding companies and their associated companies. An appreciable service will also be rendered to state regulatory commissions and to consumers in thus making available to them this information.

Sections 4 (a) and 5 (15 U.S.C.A. §§ 79d (a), 79e) do not form "a confused detail of incoherent provisions." Water Power Cases, 148 Wis. 124, 152, 134 N.W. 330, 341, 38 L.R.A.(N.S.) 526 (1912). They can well be given legal effect as a separate, workable act, even though the registration provisions also give to the registered holding company a status which subjects it to such of the other statutory provisions as may be valid. The effectiveness of the publicity provisions as a regulatory device is not thereby altered.

Defendants urge that Smith v. Cahoon (1931) 283 U.S. 553, 51 S.Ct. 582, 586, 75 L.Ed. 1264, compels a different conclusion. The defendant, a private carrier for hire, was proceeded against criminally for failure to obtain a certificate of public con-

---

[5] Summary Report of the Federal Trade Commission (Sen.Doc. 92, pt. 73–A, 70th Cong., 1st Sess. (1935) 62.

[6] "Sec. 22 (a) When in the judgment of the Commission the disclosure of such in-formation would be in the public interest or the interest of investors or consumers, the information contained in any statement, application, declaration, report, or other document filed with the Commission shall be available to the public."

venience and necessity and to pay a tax, pursuant to statute. The statute applied broadly to all "auto transportation companies" without distinguishing between private and common carriers; the court found that many of the regulations provided for therein could be constitutionally applied only to common carriers. To the suggestion that some of the regulations could be validly enforced against defendant, the court replied, "If * * * it could be said that the provisions of the statute should be severed, so as to afford one scheme. for common carriers and another for private carriers such as the appellant, the result would be to make the statute, until such severance was determined by competent authority, void for uncertainty. Either the statute imposed upon the appellant obligations to which the state had no constitutional authority to subject him, or it failed to define such obligations as the state had the right to impose with the fair degree of certainty which is required of criminal statutes."

Defendants' contention of a complete analogy between that certificate of public convenience and necessity and the registration provisions herein involved cannot be sustained. The defendant in the Cahoon Case was not entitled to a certificate as of right; the state commission could grant the certificate, "or refuse to issue the same, or may issue the same with modification, or upon such terms and conditions as in its judgment the public convenience and necessity may require." The court found that under the terms of the statute the defendant would not be entitled to a certificate unless he complied fully with the provisions of the act. Thus, the provisions relating to the application for a certificate, standing alone, were not legally operative.

The situation presented by the earlier case of Weller v. People of State of New York (1925) 268 U.S. 319, 45 S.Ct. 556, 69 L.Ed. 978, is really analogous. A New York statute required those engaged in the business of reselling theater tickets to procure a license at a fixed charge, and, in the application therefor, to give such information. as the comptroller should require to enable him to carry out the purposes of the statute. Every applicant for a license was required to file a bond guaranteeing that he would not be guilty of any fraud or extortion, and would not violate the price-fixing regulation. Any statutory violation was declared a misdemeanor. The resale of such tickets at more than 50 cents in advance of the price printed thereon was prohibited. The defense to a criminal charge of engaging in the business of reselling such tickets without having obtained a license was the unconstitutionality of the price-fixing provision and the consequent alleged unconstitutionality of the assertedly inseparable licensing requirement.

The first section of the act declared that the price or charge for admission was a matter affected with a public interest and subject to the supervision of the state to safeguard the public against exorbitant rates. The court held that if the section restricting resale prices were eliminated, a workable plan would remain; therefore, it was deemed unnecessary to pass upon the validity of the price-fixing provision. It is to be noted that the licensing provisions were upheld notwithstanding the restricted recitals in the first section, to which, however, the court made no specific reference.

Defendants' principal contention, however, to overcome the presumption of separability is that the entire act revolves around section 11 (15 U.S.C.A. § 79k), which provides for the simplification and elimination of holding company systems, and that Congress did not intend any part of the act to stand, in case section 11 should fall. They urge that the declared policy of the act in section 1 (c), 15 U.S.C.A. § 79a (c) [7] clearly shows that the ultimate objective toward. which all of the other provisions of the act are directed is

[7] "(c) When abuses of the character above enumerated become persistent and wide-spread the holding company becomes an agency which, unless regulated, is injurious to investors, consumers, and the general public;° and it is hereby declared to be the policy of this title, in accordance with which policy all the provisions of this title shall be interpreted, to meet the problems and eliminate the evils as enumerated in this section, connected with° public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce; and for the purpose of effectuating such policy to compel the simplification of public-utility holding-company systems and the elimination therefrom of properties detrimental to the proper functioning of such systems, and to provide as soon as practicable for the elimination of public-utility holding companies except as otherwise expressly provided in this title."

that set forth in section 11 (15 U.S.C.A. § 79k). As the defendants construe section 1 (c), the latter portion, declaring that to effectuate the policy of the act, the simplification and elimination of holding companies are to be compelled, is the heart of the policy, and the other parts merely redundant. The section 1 (c), in its entirety, negatives, however, any conclusion that this is the sole policy or the whole end and object of the act, which, as stated, is "to meet the problems and eliminate the evils as enumerated in this section, connected with public-utility holding companies." Simplification and elimination are but a means although not and not declared to be the exclusive means, essential "for the purpose of effectuating such policy" in whole or in so far as may be constitutionally possible. As stated by Senator Hastings, opponent of the measure, during the course of the Senate debates, "The bill itself, in section 1 (c), makes clear that the elimination of holding companies is not one of the objects of the bill, but is merely a means of effectuating the policy of meeting the problems and eliminating the evils connected with some public utility holding companies." 79 Cong.Rec.8682. The House Committee, in its analysis of the bill, section by section, reported that "Subsec. (c) declares the legislative policy embodied in Title I to be that of meeting the problems and eliminating the abuses connected with public-utility holding company systems." H.R.Rep.No.1318, 74th Cong., 1st Sess.(1935) 8. In, the President's message transmitting the report of the National Power Policy Committee, it was stated that provisions like those contained in section 11 were essential to "realistic and farsighted" legislation. See Hearings before the Senate Committee on Interstate Commerce on S. 1725, 74th Cong., 1st Sess. (1935), 2. The National Power Policy Committee had recommended that "the ultimate purpose of the legislation should be the practical elimination within a reasonable time of the holding company where it serves no demonstrably useful and necessary purpose." See Id., at 6. The Senate Committee Report also stressed the importance of the provisions of section 11 in strong terms: "As has been pointed out above, the purpose of sec. 11 is simply to provide a mechanism to create conditions under which effective Federal and State regulation will be possible. It is therefore the very heart of the title, the section most essential to the ac-complishment of the purposes set forth in the President's message." Sen.Rep. No. 621, 74th Cong., 1st Sess. (1935), 11. See, too, statement of Senator Wheeler, in 79 Cong. Rec. 9042, 9043.

The view was often expressed, however, in the debates both in the House and in the Senate that the bill presented a complete system of effective regulatory provisions, and that section 11 (15 U.S.C. A. § 79k) was entirely unnecessary to the purposes of the legislation. See 79 Cong. Rec. 8682, 10545. See, too, Senate Hearings, 445.

While the legislative history of the act thus reveals that section 11 was considered a very important, doubtless the most important step, in effectuating the purposes of the supporters of the bill, and, as such, was the object of the liveliest discussion between them and the opponents of the proposed legislation, I can find no indication that if the latters' apparently firm belief in its invalidity had been shared by the former, the registration provisions would not have been enacted as affording some, though not the fullest, measure of relief from many of the evils set forth in section 1 (b), 15 U.S.C.A. § 79a (b). The tenor of the debates seems to indicate rather that Congress intended the remainder of the statute to stand in case section 11 should be held invalid. See, e. g., 79 Cong.Rec. 14622ff. In any event, I cannot find that defendants have overcome the separability presumption created by section 32 (15 U.S.C.A. § 79z—6).

Defendants assert that the purpose of the regulatory provisions applicable to registered holding companies is but to exert continual pressure on holding companies to compel voluntary simplification and elimination and thus to facilitate the process provided for in section 11 (15 U.S. C.A. § 79k). See Senate Hearings, 7, 65, 69. Although this is not their sole purpose, since the act contemplates permanent regulation of many holding companies, it is, of course, true that in eliminating many abuses which have grown up with the holding company, the act will tend to discourage holding companies by making them less profitable. But even if the only purpose of the regulatory provisions were to induce the "continual progress of voluntary dissolution," it would not demonstrate their inseparability from section 11; induced voluntary dissolution would accomplish a desired end. And the registra-

tion provisions, with the information to be given, could play their part toward this end by illuminating the manipulations which have made many holding companies unduly profitable to the insiders.

It is next contended that the registration provisions are merely incidental to the regulatory provisions governing registered companies, that Congress did not intend them to be a regulatory device, but merely to yield information which would be helpful in the application of the other provisions of the act. Therefore, it is argued, Congress did not intend that the registration provisions should stand in case these other provisions should be held invalid. To support this conclusion, statements are adduced from the House and Senate Committee Reports explaining the purpose of section 5 (15 U.S.C.A. § 79e) to be to furnish "the mechanism by which holding companies are brought under the jurisdiction of the Commission," so that the regulatory provisions can be effectively administered. H. R. Rep. No. 1318, 74th Cong., 1st Sess. (1935) 11; Sen. Rep. No. 621, supra, at 25. But the fact that registration serves and is intended to serve the purpose of bringing holding companies under the other provisions of the act does not preclude an intention that the publicity provisions relating to the registration statement should also serve as a regulation of and an obstacle to abuses. There is ample evidence of an appreciation that the registration provisions, standing alone would serve a useful purpose and that publicity was a valuable regulatory device. A utility executive submitted to the House Committee a memorandum stating that, "Few, if any, of the alleged abuses could continue after once being exposed to public scrutiny." Hearings before House Committee on Interstate and Foreign Commerce on H. R. 5423, 74th Cong., 1st Sess. (1935) 1344. With the purpose of publicity in mind, it was also suggested that public utility regulation should take the form of amendments to the Securities Act of 1933, 48 Stat. 73, and the Securities and Exchange Act of 1934, 48 Stat. 881. See Id., at 1335. Commissioner Healy testified before the House Committee on the value of publicity: " * * * Since the Power Commission and the Trade Commission, and this committee have been looking into the holding-company situation, a great many of them have gotten religion very suddenly. * * * I think it is a very valuable commentary on the value of publicity, and that it does tend to show that disclosure under the Securities Act has a good effect. It lets the daylight in." See Id., at 135. It was also appreciated that the information filed with the registration statement and required to be kept up to date, when made available to the public, would be of great value to investors and to state regulatory commissions. See House Committee Report, 19; Senate Committee Report, 38; Senate Hearings, 53; 79 Cong. Rec. 8438, 8634.

Finally, as against all of these considerations, defendants urge the controlling effect of Carter v. Carter Coal Co. (1936) 298 U.S. 238, 56 S.Ct. 855, 874, 80 L.Ed. 1160. There certain labor-regulating provisions including minimum wage regulations, were held unconstitutional; and the majority of the court decided that they were inseparable from the price-fixing provisions of the statute on the ground that, as the statute was framed, "the interdependence of wages and prices is manifest." This was based on the purpose of Congress, as the court said, "To regulate production by the mutual operation and interaction of fixed wages and fixed prices." On that interpretation of the legislative intent, the price-fixing provision could not stand alone; therefore the question of its constitutionality did not require consideration. In the instant case, no such situation is presented. Neither the efficacy nor the workability of the registration provisions as a regulatory device through publicity is affected by the other provisions of the act; there is thus no essential interdependence between them.

We come then to the question of the validity of the registration provisions, that is, of sections 4 (a) and 5 (15 U.S.C.A. §§ 79d (a), 79e). They are unconstitutional, defendants contend, because they are not a regulation of interstate commerce or of the mails. The argument is that the information required to be filed under section 5 has no relation to and will not constitute a regulation of the acts forbidden to unregistered holding companies by section 4 (a). It is further contended that some of the acts forbidden by section 4 (a) do not constitute interstate commerce.

The question is as to the power of Congress to forbid public utility holding companies to do the acts enumerated in section 4 (a) unless they first register and file the

information required of registered companies by section 5.

Although subsidiaries which themselves are not holding companies are not forbidden to do any of the acts enumerated, holding companies of subsidiaries which commit those acts are made responsible therefor by section 4 (a) (6), 15 U.S.C.A. § 79d (a) (6). Such acts of subsidiaries are thus material in considering the validity of paragraph (6).

Section 4 (a) provides: "After December 1, 1935, unless a holding company is registered under section 5 [section 79e] of this title, it shall be unlawful for such holding company, directly or indirectly—

"(1) to sell, transport, transmit, or distribute, or own or operate any utility assets for the transportation, transmission, or distribution of, natural or manufactured gas or electric energy in interstate commerce."

The nonoperating holding company defendants are not violating paragraph (1), but each of them owns one or more subsidiaries which is committing acts therein forbidden to holding companies, by selling electric energy or gas across state lines. United Gas Public Service Company sells gas in interstate commerce, but its subsidiaries do not. The subsidiary of Houston Gulf Gas Company, itself a subsidiary of United Gas Public Service Company, makes no sales of gas in interstate commerce. Pacific Power & Light Company sells electric energy across state lines, but has no subsidiary which does so. Nebraska Power Company sells electric energy in interstate commerce; its subsidiary transmits electric energy across state lines, charging a fee for such transmission. Neither Utah Power & Light Company nor any of its subsidiaries makes sales of electric energy or gas in interstate commerce; it transmits electric energy across state lines over its own lines and for its own account.

There is no doubt of the power of Congress to regulate the rates of electric energy and gas sold in interstate commerce. State of Missouri ex rel. Barrett v. Kansas Nat. Gas Co. (1924) 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027; Public Utilities Comm. v. Attleboro Steam & Electric Co. (1927) 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549. Although this power has been directly exercised in title 2 of this act (sections 201–213 [16 U.S.C.A. §§ 791a, 796–800, 803, 807, 810, 811, 816–818, 824–825r]), Congress may, as an aid to its power to regulate rates in interstate commerce, require companies engaged in such business to furnish full information about all activities carried on by them, whether or not their other business directly affects the interstate commerce in which they engage. Interstate Commerce Comm. v. Goodrich Transit Co. (1912) 224 U.S. 194, 32 S.Ct. 436, 56 L.Ed. 729. Moreover, the publication of the information required to be filed by section 5 (15 U.S.C.A. § 79e), by its tendency to discourage abuses of the holding company device, will exert a substantial effect in the interest of consumers, by encouraging rate reductions. The business of transmitting electric energy or gas for other companies in interstate commerce is governed by the same considerations as the sale of electric energy or gas across state lines. The transmission of electric energy or gas across state lines by a company to its own local distributing system is interstate commerce (Utah Power & Light Co. v. Pfost (1932) 286 U.S. 165, 182, 52 S.Ct. 548, 552, 76 L.Ed. 1038) and like transportation of persons or articles across state lines even when no sales are involved is, as such, subject to federal regulation (Caminetti v. United States (1917) 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168; United States v. Simpson (1920) 252 U.S. 465, 40 S.Ct. 364, 64 L.Ed. 665, 10 A.L.R. 510; see H. B. Marienelli, Ltd., v. United Booking Offices (D.C.S.D.N.Y.1914) 227 F. 165. Congress may therefore require such companies to furnish information regarding their business.

Section 4 (a) (2), 15 U.S.C.A. § 79d (a) (2), forbids unregistered holding companies "(2) by use of the mails or any means or instrumentality of interstate commerce, to negotiate, enter into, or take any step in the performance of, any service, sales, or construction contract undertaking to perform services or construction work for, or sell goods to, any public-utility company or holding company."

The operating subsidiaries of American Gas, all located outside of New York state, receive managerial and supervisory services from the centralized executive and technical staff of 260 persons maintained by American Gas in New York City. No other company in the Bond & Share system renders them any except financial services and advice. Some of the services ren-

dered by American Gas to its operating subsidiaries may be grouped under the various departments of the service organization, each rendering specialized services. The accounting and auditing departments supervise and audit the accounts of every operating company, and send out auditors for this purpose to the various states in which the subsidiaries are located. These activities result in extensive communication between the subsidiaries and the service organization, and the transmission of a large number of papers and reports between them. These departments also perform the necessary clerical work connected with annual stockholders' meetings of all the companies, such as the issuance of notices and the distribution of copies of the minutes. The Stock and Dividend Department maintains stock records, distributes dividend checks, and supplies stockholders' lists to local officials. The Purchasing Department negotiates purchase contracts with manufacturers and jobbers for materials and apparatus required by the operating companies. Shipments are made by the vendor directly to the operating company. A substantial part of such supplies and apparatus so shipped are transported across state lines. The Commercial Department promotes appliance and energy sales, and supervises rate structures and advertising. In rendering these services, large numbers of booklets, pamphlets, circular letters, and memoranda are distributed to local companies, and experts employed by the department spend a substantial portion of their time on the properties of the local companies. The Appraisal and Insurance Department supervises the placing of all insurance taken out by the operating companies, and keeps a number of experts in the field a large part of the time. The Engineering Department prepares plans and designs for construction work and supervises the actual construction; it renders, too, general engineering services needed by operating companies in their maintenance and development, necessitating the sending of various reports to the operating companies. Members of several of the departments are required to visit local properties.

With one or two exceptions, there are no written contracts for these services between the operating companies and American Gas; the services are rendered pursuant to an informal understanding with each operating company and at cost, by allocation among the operating companies.

All of the operating subsidiaries in the Bond & Share system except American Gas subsidiaries receive managerial and supervisory services from Ebasco Services Incorporated (hereinafter called Ebasco), a subsidiary of Bond & Share. The stipulation states:

"For many years prior to November 25, 1935, Bond and Share rendered engineering, financial accounting, and other services to the holding companies and operating companies included in the American Company System, Electric Company System and National Company System, pursuant to the terms of written contracts. * * *

"On or about November 22, 1935, and pursuant to authority from the Board of Directors of Bond and Share, the officers of Bond and Share caused Ebasco * * * to be incorporated under the laws of the State of New York for the purpose and with the intention of transferring to said corporation the service organization and service business theretofore maintained by Bond and Share for operating utility companies. * * *

"Upon the organization of Ebasco, Bond and Share assigned to it (a) all of the existing service contracts between Bond and Share and operating public utility companies * * * (b) all contracts between Bond and Share and other corporations with respect to the purchase of commodities, discount arrangements and installation and repair work for or on behalf of the operating utility companies with which Bond and Share had entered into service contracts; and (c) certain miscellaneous contracts between Bond and Share and other corporations, useful in connection with the performance of such service contracts."

The serviced operating companies are divided into five regional groups, and the services to the companies in each group are under the general supervision of a senior operating supervisor, much of whose time is spent in visiting properties of the operating companies. Each senior operating sponsor is assisted by an accounting sponsor, an engineering sponsor, a budget sponsor, a rate sponsor, and a sales sponsor, each of whom spends a substantial part of his time visiting properties of operating companies to which he is assigned. All sponsors "keep fully and continuously informed upon the detailed activities of each of the serviced companies to which

they are assigned, by means of frequent visits to the properties of such companies, active correspondence and telephonic and telegraphic communications with the officers and department heads of such companies, and through the detailed periodic reports and budgets which are prepared by the serviced companies and copies of which are transmitted to Ebasco."

Ebasco maintains a number of specialized departments for the purpose of rendering specialized services to the operating companies. The accounting department prepares accounting systems and procedures and periodic and special bulletins and reports on accounting problems, which are transmitted to the serviced companies through the mails. The members of the accounting department are required to visit operating properties at frequent intervals. The engineering department offers advice on designs of structures and plants, valuations, operating costs, and many other engineering problems. Periodic reports are sent to the serviced companies on production costs of generating plants. Many other "reports, memoranda, and engineering letters upon technical and engineering phases of the operation of utility properties" are sent to the operating companies through the mails. The engineers spend a substantial portion of their time visiting local companies. The purchasing department negotiates purchase contracts with manufacturers of materials, supplies, and equipment required by the serviced companies, and a substantial portion of the purchases are transported across state lines from the manufacturer or jobber to the serviced company. Freight rates are negotiated, and shipments classified and routed; small shipments are consolidated so as to be included in carload quantities. The budget department "prepares both general and special reports and studies with respect to the preparation and revision of budget forms and forecasts and the theories and practices of budget control and transmits them (as well as the budget forms above referred to) to the serviced operating companies through the mails." The service also includes various other reports periodically and specially made to the operating companies. The insurance department negotiates insurance policies for the serviced companies. Members of this department make frequent trips to the operating companies to ascertain their insurance needs. Periodic and special re-

ports, too, are prepared and transmitted to the serviced companies through the mails. The statistical department transmits various reports and other materials to the serviced companies, and transmits information about the serviced companies to creditors and investors on request. The tax department engages in communication with the operating companies in assisting them with tax returns, and members of the department visit local properties for the same purpose. Reports of new matters affecting tax liabilities of serviced companies are periodically transmitted to them through the mails. The rate department "prepares periodic and special studies and reports dealing with rate problems for general distribution among the serviced companies, and transmits them to such companies through the mails. * * * Approximately one-half of the time of the members of the rate department is spent in visiting the properties of the serviced companies." The sales department prepares sales plans for the use of serviced companies in their sales of electric energy, gas, and gas and electric appliances. A large part of the time of most of the experts in this department is spent visiting the properties of serviced companies. "Samples of advertising copy, folders, pamphlets, photographs and other promotional material" are distributed to operating companies. Also, various reports are transmitted to the companies. The secretarial department assists the serviced companies "in matters concerning the forms of corporate procedure and general secretarial activities." The treasury department makes use of the mails in the course of servicing the operating properties by sending out redemption notices to bondholders. The services rendered by the corporate department include advice to the operating companies as to corporate and financial structures, listing of securities, acquisition and disposal of properties, and financial programs. Ebasco's subsidiary, Phœnix Engineering Corporation (hereinafter called Phœnix), performs special engineering and construction services for the operating companies. These services include the furnishing of plans and designs for plants and other production and transmission facilities, the construction of such plants or facilities, and the supervision of construction work performed by other contractors. Construction services are rendered under standard construction contracts covering specific projects. "The

performance of such construction contracts requires frequent communication between the New York office of Phœnix and its field staff, and the transmission of plans, designs, instructions, information and funds from New York City to the field." Phœnix has a general construction contract with only one operating company. It now has three special construction contracts, each for a specific power station.

The fees charged by Ebasco for some of the services rendered by it are computed upon a percentage of the monthly operating revenues of the serviced companies. Fees for special engineering services and construction services are computed upon a different basis, in part upon cost.

Bond & Share has rendered financing services to American Gas and its subsidiaries as well as to the other intermediate holding companies of Bond & Share and their subsidiaries. As to the American Gas System, "The last public financing by issue of bonds, debentures, preferred stocks or other securities by American Gas or any of its subsidiaries was accomplished in the year 1928, except that sales of preferred stock of subsidiary companies (purchased by American Gas from such companies) to customers in customer-ownership campaigns in the territory in which such subsidiary companies operate have been made up to and including the year 1932." While rendering financing services to the American Gas System, Bond & Share directed the sales of securities, and prepared and transmitted circulars and other advertising material to the offices of the issuing company. Similar financing and refinancing services were performed by Bond & Share to the other companies in its system until 1935.

Discussion of the validity of section 4 (a) (2), 15 U.S.C.A. § 79d (a) (2), must begin with a consideration of the abuses at which it is aimed. Those of the holding company achieved through the service contract were specified by Congress only after examining various reports of extensive investigations carried on under Congressional supervision. Section 1 (b), 15 U.S.C.A. § 79a (b), reads, "Upon the basis of facts disclosed by the reports of the Federal Trade Commission * * * and otherwise disclosed and ascertained, it is hereby declared that the national public interest, the interest of investors in the securities of holding companies and their subsidiary companies and affiliates, and the interest of consumers of electric energy and natural and manufactured gas are or may be adversely affected * * * (2) when subsidiary public-utility companies are subjected to excessive charges for services, construction work, equipment, and materials, or enter into transactions in which evils result from an absence of arm's-length bargaining or from restraint of free and independent competition; when service, management, construction, and other contracts involve the allocation of charges among subsidiary public-utility companies in different States so as to present problems of regulation which cannot be dealt with effectively by the States." Section 1 (c), 15 U.S.C.A. § 79a (c), further states that these abuses have become "persistent and wide-spread." See in this connection United Fuel Gas Co. v. R. R. Comm. (1929) 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390; Smith v. Illinois Bell Telephone Co. (1930) 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255; Western Distributing Co. v. Public Serv. Comm. (1932) 285 U.S. 119, 52 S.Ct. 283, 76 L.Ed. 655; Columbus Gas & Fuel Co. v. Public Utilities Comm. (1934) 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327, 91 A.L.R. 1403.

After finding that service contracts are tainted with fraud because they are entered into in the absence of arm's-length bargaining and that they are against the public interest because negotiated by restraint of free and independent competition, Congress has provided by section 4 (a) (2), 15 U.S.C.A. § 79d (a) (2), that the mails and the instrumentalities of interstate commerce shall be closed to unregistered holding companies in negotiations, transactions, and other uses leading up to and growing out of such contracts. There is abundant authority to sustain such regulations.

In federal regulation of the use of the mails, statutes have been upheld forbidding the use of the mails to promote lotteries or schemes to defraud. Public Clearing House v. Coyne (1904) 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092; Badders v. United States (1916) 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706. Not only may the use of the mails be forbidden in the carriage of the lottery ticket itself, but circulars or newspapers containing advertisements of a lottery may be kept out of the mails. Ex parte Jackson (1877) 96 U.S. 727, 24 L. Ed. 877; In re Rapier (1892) 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93; Horner v.

United States (1892) 143 U.S. 570, 12 S.Ct. 522, 36 L.Ed. 266; cf. Grimm v. United States (1895) 156 U.S. 604, 15 S.Ct. 470, 39 L.Ed. 550. More recently, the provisions of the Securities Act of 1933, as amended by act June 6, 1934 (15 U.S.C.A. § 77a et seq.), forbidding the mailing of unregistered securities have been upheld. Jones v. Securities and Exchange Comm. (C.C.A.2d, 1935) 79 F.(2d) 617, reversed on other grounds, Jones v. Securities & Exchange Comm. (1936) 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015. It was further held therein that it was not an unreasonable regulation to compel all securities to be registered before mailing, without a prior determination as to whether any particular security was fraudulent or not. Cf. Public Clearing House v. Coyne, supra. These cases fully sustain the regulation here under consideration. The use of the mails may be forbidden in the formation of service contracts between a holding company and its subsidiaries, and their use may be denied in the performance of such contracts by unregistered holding companies.

The power of Congress to regulate interstate commerce for present purposes is sustained by the cases which upheld statutes forbidding the use of the channels of interstate commerce for transporting lottery tickets, misbranded or adulterated food and drugs, women for immoral purposes, stolen automobiles, and intoxicating liquors. Champion v. Ames (Lottery Case) (1903) 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492; Weeks v. United States (1918) 245 U.S. 618, 38 S.Ct. 219, 62 L.Ed. 513; Pittsburgh Melting Co. v. Totten (1918) 248 U.S. 1, 39 S.Ct. 3, 63 L.Ed. 97; Hipolite Egg Co. v. United States (1911) 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364; Caminetti v. United States (1917) 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A. 1917F, 502, Ann.Cas.1917B, 1168; Brooks v. United States (1925) 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407; United States v. Simpson (1920) 252 U.S. 465, 40 S.Ct. 364, 64 L.Ed. 665, 10 A.L.R. 510. In upholding the constitutionality of the Securities Exchange Act of 1934 (48 Stat. 881 [15 U.S.C.A. § 78a et seq.]), this court said, "It cannot be doubted that Congress may close the channels of interstate commerce likewise to such transactions in corporate securities as it has reasonably found and declared to be directly detrimental to the financial health of the public generally." Securities and Exchange Comm. v. Torr (D.C.S.D.N.Y.1936) 15 F. Supp. 315, 319 (Patterson, J.), reversed on other grounds (C.C.A.2d, Jan. 18, 1937) 87 F.(2d) 446; cf. United States v. Ferger (1919) 250 U.S. 199, 39 S.Ct. 445, 63 L. Ed. 936.

Ebasco and American Gas are performing service contracts through the use of the channels of interstate commerce in several ways. Negotiating the purchase of materials and equipment to be sent across state lines is making use of the instrumentalities of interstate commerce. Furst v. Brewster (1931) 282 U.S. 493, 51 S.Ct. 295, 75 L.Ed. 478; Federal Trade Comm. v. Smith (D.C.S.D.N.Y. 1932) 1 F. Supp. 247; cf. Federal Trade Comm. v. Pacific States Paper Trade Ass'n (1927) 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534; Di Santo v. Pennsylvania (1927) 273 U.S. 34, 47 S.Ct. 267, 71 L.Ed. 524. Consolidating small shipments of goods which have begun an interstate journey, so as to include them in carload quantities, constitutes a use of the instrumentalities of interstate commerce. National Labor Relations Board v. National New York Packing & Shipping Co. (C.C.A.2d, 1936) 86 F.(2d) 98. The following activities likewise constitute such a use: Sending out employees to visit properties of the various local companies in the course of rendering engineering and other services to the operating companies [Bay City v. Frazier (C.C.A.6th, 1935) 77 F.(2d) 570; cf. Caminetti v. United States, supra; H. B. Marienelli, Ltd. v. United Booking Offices, supra]; the shipment of plans, booklets, pamphlets, papers, instructions, advertising material, and like articles across state lines and continuous communication across state lines [International Textbook Co. v. Pigg (1910) 217 U.S. 91, 30 S.Ct. 481, 54 S.Ct. 678, 27 L.R.A.(N.S.) 493, 18 Ann.Cas. 1103; Charles A. Ramsay Co. v. Associated Bill Posters (1923) 260 U.S. 501, 43 S.Ct. 167, 67 L.Ed. 368; Federal Trade Comm. v. Civil Service Training Bureau, Inc. (C.C.A.6th, 1935) 79 F.(2d) 113; Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co. (1934) 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356; National Labor Relations Board v. Associated Press (C.C.A.2d, 1936) 85 F.(2d) 56; Binderup v. Pathe Exchange, Inc. (1923) 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308]. This is not to say that

the entire business of Ebasco or American Gas constitutes interstate commerce and is therefore subject to unlimited federal regulation. The mere use of an instrumentality of interstate commerce does not necessarily subject the entire business of the user to federal regulation under the commerce clause. Hart v. B. F. Keith Vaudeville Exchange (C.C.A.2d, 1926) 12 F.(2d) 341, 47 A.L.R. 775, certiorari denied (1926) 273 U.S. 703, 47 S.Ct. 97, 71 L.Ed. 849; Federal Base Ball Club v. National League (1922) 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, 26 A.L.R. 357. What is regulated in connection with the performance of service contracts is the use of the channels of interstate commerce; this use is validly prohibited in the denial of interstate facilities to certain service contracts.

■ Conditioning the use of interstate channels on registration and filing information is a reasonable method under the federal commerce power of regulating the evils growing out of the service contract. It is not a disguised attempt to invade the powers reserved to the states. Hammer v. Dagenhart (1918) 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas. 1918E, 724.

■ Section 4 (a) (3), 15 U.S.C.A. § 79d (a) (3), prohibits unregistered holding companies "to distribute or make any public offering for sale or exchange of any security of such holding company, any subsidiary company or affiliate of such holding company, any public-utility company, or any holding company, by use of the mails or any means or instrumentality of interstate commerce, or to sell any such security having reason to believe that such security, by use of the mails or any means or instrumentality of interstate commerce, will be distributed or made the subject of a public offering." Acts forbidden by this paragraph have not been committed by American Gas since 1932, or by Bond & Share since 1935, or by Ebasco at any time. Defendants state in their answer: "Defendants are without knowledge whether they will in the future distribute or make public offerings for sale or exchange of their own securities or the securities of their subsidiary companies or affiliates, or any thereof." This, however, is negatived by another statement in the answer: "The activities forbidden by paragraphs (3), (4) and (6) of said section 4 (a) [15 U.S.C.A. § 79d (a) (3, 4, 6)] are essential to the normal and ordinary conduct of the business of each of the defendants and the use, conservation and development of its properties. It is essential and necessary that each of the defendants, to maintain the integrity of its property and investments, own, control and hold with power to vote, the securities of its subsidiary companies which do the things prohibited in paragraphs (1) to (5), inclusive, of said section 4 (a) [15 U.S.C.A. § 79d (a) (1–5)] as and to the extent hereinbefore alleged." This constitutes a threat that paragraph (3) will be violated. The validity of this paragraph is sustained by cases upholding the Securities Act of 1933 and the Securities Exchange Act of 1934. Securities and Exchange Comm. v. Jones (D.C.S.D.N.Y.1935) 12 F.Supp. 210, affirmed Jones v. Securities and Exchange Comm., supra; Securities and Exchange Comm. v. Torr, supra.

Section 4 (a) (4), 15 U.S.C.A. § 79d (a) (4), forbids unregistered holding companies "by use of the mails or any means or instrumentality of interstate commerce, to acquire or negotiate for the acquisition of any security or utility assets of any subsidiary company or affiliate of such holding company, any public-utility company, or any holding company."

■ Defendants have made the same assertions with similar threats of violation in regard to this paragraph as to the preceding one. The acquisition of utility securities and assets has an important effect upon, and is closely tied up with their distribution and with the formation and performance of service contracts. Such acquisition offers opportunities for the extension of servicing programs to more properties; it presents opportunities for the issuance of further securities and the formation of new companies to be serviced in the usual manner. The prohibition of the use of interstate commerce facilities and the use of the mails for acquisitions by unregistered holding companies is a reasonable method of reinforcing the regulations in paragraphs (2) and (3) of section 4 (a), 15 U.S.C.A. § 79d (a) (2, 3).

Section 4 (a) (5), 15 U.S.C.A. § 79d (a) (5), forbids a holding company, unless registered, "to engage in any business in interstate commerce." It does not appear that defendants or their subsidiaries are engaging or threatening to engage in any interstate business or activities other than those covered by the other provisions of section 4 (a); a determination of the va-

lidity of paragraph (5) is therefore unnecessary.

Section 4 (a) (6), 15 U.S.C.A. § 79d (a) (6), forbids unregistered holding companies "to own, control, or hold with power to vote, any security of any subsidiary company thereof that does any of the acts enumerated in paragraphs (1) to (5), inclusive, of this subsection." Inasmuch as paragraph (5) is not involved in this case, the question is whether Congress may validly require registration by and information from holding companies if any of their subsidiaries do any of the acts enumerated in paragraphs (1) to (4), acts which it may constitutionally forbid to be done by the holding companies themselves. Section 2 (a) (7), 15 U.S.C.A. § 79b (a) (7), defines a holding company as "any company, which directly or indirectly owns, controls, or holds with power to vote, 10 per centum or more of the outstanding voting securities of a public-utility company or of a company which is a holding company." But a company holding the prescribed percentage of stock in another company may apply to the commission for an order that it is not a holding company, and the commission must so declare if it "finds that the applicant (i) does not, either alone or pursuant to an arrangement or understanding with one or more other persons, directly or indirectly control a public-utility or holding company either through one or more intermediary persons or by any means or device whatsoever, (ii) is not an intermediary company through which such control is exercised." Corresponding provisions are made as to subsidiary companies in section 2 (a) (8), 15 U.S.C.A. § 79b (a) (8). Not only have defendants not applied for exemptions under these provisions, but they assert in their answer that they are not entitled to apply for exemptions. It is therefore admitted, for the purposes of the act, that defendant holding companies control their respective subsidiaries.

Paragraph (6) is an essential part of the regulations in the registration provisions, if the other paragraphs of section 4 (a) are to have any appreciable effect. Without it, it is only necessary for any holding company to transfer its activities to its subsidiaries in order to escape the regulations. A good example of how this might be done is provided in the organization of Ebasco, and the transfer of its service contracts and facilities by Bond & Share to this 100 per cent. owned subsidiary. As to the activities normally carried on by subsidiaries, it is entirely reasonable that a controlling holding company be made responsible for them. When there is control, as admittedly prevails here, it is the holding company which in any real sense causes the activities to be carried on. The statute thus but recognizes and gives effect to the practical situation. In Federal Trade Comm. v. Smith, supra, a public utility holding company was held to be engaged in interstate commerce and therefore subject to federal regulation because of its control of its subsidiaries. The problem of disregarding or piercing through the corporate entities is not here involved; the act, without denying the separateness of the corporations as such, charges the holding company with responsibility for those interstate activities which, by virtue of control, it causes the subsidiary to engage in.

A decree will be entered on the bill and answer enjoining defendants as prayed for, until they shall have registered pursuant to section 5 (15 U.S.C.A. § 79e).

There is no violation of the Fifth Amendment, as urged by defendants. The limitation to public utility holding companies which control subsidiaries dealing in gas and electricity, involves no arbitrary selection or classification, even though, in the public interest, the regulations might well have been extended to cover other holding companies. The legislative body "may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed." Central Lumber Co. v. South Dakota (1912) 226 U. S. 157, 160, 33 S.Ct. 66, 67, 57 L.Ed. 164. The congressional findings, based upon a mass of evidence and information as recited in the act, disclosed that the welfare of consumers of electric energy and gas and investors in public utility companies controlled by holding companies and in holding companies required this immediate protection. These findings are not shown to be unfounded or unreasonable. Radice v. People of State of New York (1924) 264 U.S. 292, 44 S.Ct. 325, 68 L.Ed. 690. Compare Southern Boulevard R. Co. v. City of New York (C.C.A.2d, 1936) 86 F. (2d) 633. That the regulation imposed through the authorized publicity of the information required to be furnished in the

registration statement is reasonably connected with the evils sought to be remedied, is clear from the discussion of the other points in the case.

On the cross-bill and counterclaim, cross-plaintiffs ask that cross-defendants be enjoined from taking any steps to enforce the act against them and for a declaratory judgment under section 274d of the Judicial Code, as amended, 28 U.S.C. § 400 (28 U.S.C.A. § 400), that every provision of the act is unconstitutional. In so far as relief is sought from the provisions of the act applicable to unregistered companies, the issues have been determined on the bill and answer. The questions presented therefore concern the right of cross-plaintiffs to an injunction against the enforcement of the provisions of the act relating solely to registered companies or at least to a declaratory judgment that each of such provisions of the act is unconstitutional.

 As a basis for injunctive relief, irreparable injury must be shown to be impending or threatened. Spielman Motor Sales Co. v. Dodge (1935) 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322. But until the act becomes applicable to cross-plaintiffs, they show no such injury. The provisions of the act other than the registration requirement apply only to registered companies.

Although the decree to be entered, directing a cessation of the activities forbidden by section 4 (a), 15 U.S.C.A. § 79d (a), until registration, will, if ultimately sustained, probably result in registration, some months at least will necessarily elapse before this is done. The stipulation recites that each defendant which is a holding company is violating "one or more provisions of section 4 (a) of the act, and, unless otherwise ordered by a final decree not thereafter reversed or vacated, intends to continue, without registering, to engage in such activities and transactions." Since the defendants intend to secure a review of these proceedings, it is clear that they will not register unless and until they are required so to do by decision of the Supreme Court. Therefore, the regulations pertaining to registered holding companies will not affect them for at least some time.

 Cross-plaintiffs are in no danger at the hands of cross-defendants or any of them before a final decision by the Supreme Court; there has been public announcement that before such decision, no steps would be taken because of failure to comply with the act and that penalties will even then not be enforced or action leading thereto taken by any of cross-defendants, because of the earlier failure to comply therewith. True it is that the declared intention of the individual cross-defendants will not bind their successors in office. But the cross-bill so far as it seeks relief is necessarily directed against the named cross-defendants and from them there is no danger or justifiable fear thereof. This court would not be justified in the circumstances in deciding intricate constitutional questions in what is clearly a hypothetical case. Such determinations should be based on cross-plaintiffs' post-registration activities. These may or may not amount to a violation of some one or more of the alleged unconstitutional provisions pertaining to registered companies. The situation may at such time give rise to an actual controversy between some or possibly all of the parties, necessitating in due course of judicial proceedings after the prescribed administrative steps, the decision of the constitutionality of some or perhaps all of such provisions of the act. In the circumstances, there is no merit in the contention that the court should deal with the cross-plaintiffs as if they had already registered. Cf. Ex parte La Prade (1933) 289 U.S. 444, 53 S.Ct. 682, 77 L.Ed. 1311.

The Declaratory Judgment Act is likewise of no avail in the quest for a judicial pronouncement as to the validity of each of these provisions. The statute by its terms and necessarily, in order that it may be upheld as constitutional, is to be enforced in "cases of actual controversy." There is no such controversy in this case except as to the matters decided on bill and answer. Whether or not irreparable injury or a threat thereof must be shown need not be determined; the parties must at least be directly affected by the alleged unconstitutional provisions. Such is not the condition of unregistered companies. A difference of opinion between the parties as to the constitutionality of statutory provisions which are now inapplicable, and some of which may not apply even after registration, does not constitute at this time a justiciable actual controversy within the statute. United States v. West Virginia (1935) 295 U.S. 463, 55 S.Ct. 789, 79 L.Ed. 1546; Ashwander v. Tennessee Valley Authority (1936) 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688; North American Com-

pany v. Landis (Sup.Ct.D.C. Jan. 6, 1936),[8] 3 U.S.L.Week 407, order vacated on other grounds by the United States Supreme Court, Dec. 7, 1936, 57 S.Ct. 163, 81 L.Ed. —.

In view of the conclusions reached on the bill and answer as well as on the cross-bill and reply, it is unnecessary to determine a number of interesting questions raised in the briefs and arguments.

The motion to dismiss the counterclaim and cross-bill must be sustained.

---

[8] See 66 App.D.C. 141, 85 F.(2d) 398.