## ELECTRIC BOND & SHARE CO. ET AL. *v.* SECURITIES AND EXCHANGE COMM'N ET AL.

No. 636.   Argued February 7, 8, 9, 1938.—Decided March 28, 1938.

420

*Messrs. Thomas D. Thacher* and *John F. MacLane,* with whom *Messrs. Frank A. Reid* and *A. J. G. Priest* were on the brief, for petitioners.

*Assistant Attorney General Jackson* and *Mr. Benjamin V. Cohen,* with whom *Attorney General Cummings, Solicitor General Reed, Assistant Solicitor General Bell,* and *Messrs. Allen E. Throop, Thomas G. Corcoran, Paul A. Freund, John J. Abt,* and *Frederick B. Wiener* were on the brief, for respondents.

Mr. Chief Justice Hughes delivered the opinion of the Court.

The Securities and Exchange Commission brought this suit to enforce the provisions of §§ 4 (a) and 5 of the

Public Utility Holding Company Act of 1935. 49 Stat. 803, 812, 813. These sections provide for registration with the Commission of holding companies, as defined, § 5 (a), and prohibit the use of the mails and the instrumentalities of interstate commerce to those companies which fail to register. § 4 (a). Section 5 (b) provides for the filing of a registration statement giving information with respect to the organization, financial structure and nature of the business of the registrant, together with various details of operations.

Defendants, including intervenors, contested the validity of these provisions and sought by cross bill a declaratory judgment that the Act was invalid in its entirety, as being in excess of the powers granted to Congress by § 8 of Article I, and in violation of § 1 of Article I and of the Fifth and Tenth Amendments, of the Constitution of the United States. The District Court sustained the validity of §§ 4 (a) and 5, and granted an injunction accordingly. The cross bill was dismissed for want of equity and for lack of any actual controversy within the meaning of the Federal Declaratory Judgment Act of 1934. 18 F. Supp. 131. The Circuit Court of Appeals affirmed the decree. 92 F. (2d) 580. Certiorari was granted.

The suit was brought against the Electric Bond and Share Company and fourteen associated public utility companies. Of these, it appears that seven have ceased to be holding companies within the meaning of the Act, two [1] before the cause was heard by the District Court and five [2] since the decree. The remaining companies against whom the decree of injunction runs are Electric Bond and Share Company, American Gas and Electric

---

[1] Idaho Power Company and The Montana Power Company.

[2] United Gas Corporation, United Gas Public Service Company, Houston Gulf Gas Company, Nebraska Power Company, and Power Securities Company.

Company, American Power & Light Company, National Power & Light Company, Electric Power & Light Corporation, Lehigh Power Securities Corporation, Utah Power & Light Company, and Pacific Power & Light Company.

The decree provides in substance, as to each of these defendants, that after a day specified and until such defendant shall cease to be a holding company as defined in the Act, or shall register with the Securities and Exchange Commission as provided in § 5 (a), it shall not carry on any of the activities in interstate commerce or through the mails which are forbidden to non-registered holding companies by Paragraphs (1), (2), (3), (4) and (6) of § 4 (a). The provisions of §§ 4 (a) and 5 are set forth in the margin.[3]

---

[3] "Sec. 4. (a). After December 1, 1935, unless a holding company is registered under section 5, it shall be unlawful for such holding company, directly or indirectly—

"(1) to sell, transport, transmit, or distribute, or own or operate any utility assets for the transportation, transmission, or distribution of, natural or manufactured gas or electric energy in interstate commerce;

"(2) by use of the mails or any means or instrumentality of interstate commerce, to negotiate, enter into, or take any step in the performance of, any service, sales, or construction contract undertaking to perform services or construction work for, or sell goods to, any public-utility company or holding company;

"(3) to distribute or make any public offering for sale or exchange of any security of such holding company, any subsidiary company or affiliate of such holding company, any public-utility company, or any holding company, by use of the mails or any means or instrumentality of interstate commerce, or to sell any such security having reason to believe that such security, by use of the mails or any means or instrumentality of interstate commerce, will be distributed or made the subject of a public offering;

"(4) by use of the mails or any means or instrumentality of interstate commerce, to acquire or negotiate for the acquisition of any security or utility assets of any subsidiary company or affiliate of

The decree further provides that the injunction and the dismissal of the cross bill shall be without prejudice "to any rights or remedies in law or in equity" which defendants may have after registration, and leaves defendants free to challenge the validity of any of the provisions of the Act other than §§ 4 (a) and 5. The dismissal of. the

such holding company, any public-utility company, or any holding company;

"(5) to engage in.any business in interstate commerce; or

"(6) to own, control, or hold with power to vote, any security of any subsidiary company thereof that does any of the acts enumerated in paragraphs (1) to (5), inclusive, of this subsection.

. . . . .

"Sec. 5. (a) On or at any time after October 1, 1935, any holding company or any person [sic] purposing to become a holding company may register by filing with the Commission a notification of registration, in such form as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers. A person shall be deemed to be registered upon receipt by the Commission of such notification of registration.

"(b) It shall be the duty of every registered holding company to file with the Commission, within such reasonable time after registration as the Commission shall fix by rules and regulations or order, a registration statement in such form as the Commission shall by rules and regulations or order prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers. Such registration statement shall include—

"(1) such copies of the charter or articles of incorporation, partnership, or agreement, with all amendments thereto, and the bylaws, trust indentures, mortgages, underwriting arrangements, voting-trust agreements, and similar documents, by whatever name known, of or relating to the registrant or any of its associate companies as the Commission may by rules and regulations or order prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers;

"(2) such information in such form and in such detail relating to, and copies of such documents of or relating to, the registrant and its associate companies as the Commission may by rules and regulations

cross bill is also declared to be without prejudice "to any rights or remedies in law or in equity" which the intervening defendants "may have or be entitled to upon the Act

or order prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers in respect of—

"(A) the organization and financial structure of such companies and the nature of their business;

"(B) the terms, position, rights, and privileges of the different classes of their securities outstanding;

"(C) the terms and underwriting arrangements under which their securities, during not more than the five preceding years, have been offered to the public or otherwise disposed of and the relations of underwriters to, and their interest in, such companies;

"(D) the directors and officers of such companies, their remuneration, their interest in the securities of, their material contracts with, and their borrowings from, any of such companies;

"(E) bonus and profit-sharing arrangements;

"(F) material contracts, not made in the ordinary course of business, and service, sales, and construction contracts;

"(G) options in respect of securities;

"(H) balance sheets for not more than the five preceding fiscal years, certified, if required by the rules and regulations of the Commission, by an independent public accountant;

"(I) profit and loss statements for not more than the five preceding fiscal years, certified, if required by the rules and regulations of the Commission, by an independent public accountant;

"(3) such further information or documents regarding the registrant or its associate companies or the relations between them as the Commission may by rules and regulations or order prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers.

"(c) The Commission by such rules and regulations or order as it deems necessary or appropriate in the public interest or for the protection of investors or consumers, may permit a registrant to file a preliminary registration statement without complying with the provisions of subsection (b); but every registrant shall file a complete registration statement with the Commission within such reasonable period of time as the Commission shall fix by rules and regulations or order, but not later than one year after the date of registration.

"(d) Whenever the Commission, upon application, finds that a registered holding company has ceased to be a holding company, it

being made applicable to them by the registration of any holding company of which they are subsidiary companies." All rights of defendants, including intervenors, are thus fully reserved with respect to the application to them of any provision of the Act outside of those contained in the particular sections which are enforced by the decree.

Petitioners insist that the Act is invalid as a whole; that the provisions of §§ 4 (a) and 5 are not separable from the remainder; that these provisions, if separately considered, do not constitute a valid regulation of interstate commerce and the mails; and that the cross bill presented a controversy upon the merits of which the defendants, including intervenors, were entitled to the judgment of the court.

*First.* The initial question is whether the defendant companies, against which the decree for injunction runs, are engaged in activities which bring them within the ambit of congressional authority. Upon this point there seems to be no serious controversy, and for the purpose of the present decision we do not find it necessary to make a comprehensive statement of the corporate setup and operations of the respective defendants. The facts were fully set forth in an elaborate stipulation which underlay the findings of fact of the trial court. A brief statement addressed to the point now under consideration will suffice.

Electric Bond and Share Company is styled in the findings as "the top holding company" in "a holding-company system" in which all the other defendants and intervening defendants together with numerous other companies are subsidiaries. Electric Bond and Share Company owns substantial minorities of the voting stocks

shall so declare by order and upon the taking effect of such order the registration of such company shall, upon such terms and conditions as the Commission finds and in such order prescribes as necessary for the protection of investors, cease to be in effect. The denial of any such application by the Commission shall be by order."

of the defendants American Gas and Electric Company, American Power & Light Company, National Power & Light Company, and Electric Power & Light Corporation. These companies in turn own directly or through subholding companies substantial majorities, in some cases approximating complete ownership and in all cases sufficient to insure voting control, of the common stocks of operating gas and electric utilities. The "electric operations" of subsidiaries in the Bond and Share system are conducted in thirty-two States. Some operate only within a single State, some in two or more States, transmitting energy across state lines for their own account, and some sell energy at wholesale in interstate commerce.

Until shortly prior to the institution of this suit Electric Bond and Share Company rendered services to both holding and operating companies under service contracts. After the approval of the Act, it formed a wholly-owned subsidiary, Ebasco Services Incorporated, to take over the servicing of the operating companies, and the servicing of the holding companies was discontinued. The performance of service contracts by Ebasco, operating as a subsidiary and on behalf of Electric Bond and Share Company, constitutes an extensive business in rendering continuous expert, specialized, and technical service, advice, and assistance to the serviced companies upon every phase of the utility enterprise. Phoenix Engineering Corporation, a wholly-owned subsidiary of Ebasco, performs construction work for subsidiary public-utility companies in the Bond and Share system. The American Gas and Electric Company also performs services for subsidiary operating companies.

We need not go further in the description of the operations of these Companies, as petitioners concede that the carrying out of these service contracts, as found by the trial court, involves continuous and extensive use of the

mails and instrumentalities of interstate commerce, although petitioners are careful to qualify the concession by saying that they agree with the trial court that "this is not to say that the entire business of Ebasco or American Gas constitutes interstate commerce and is therefore subject to unlimited federal regulation."

Petitioners also state with respect to American Power & Light Company, National Power & Light Company, and Electric Power & Light Corporation, that while it is insisted that these are simply investment holding companies and that their business as such is not interstate commerce, they may "from time to time engage in transactions in interstate commerce or may use the instrumentalities of interstate commerce in particular transactions, such as the distribution of securities, in such manner that those particular activities become the subject of federal regulation."

The trial court found that one or more subsidiary electric-utility companies of Lehigh Power Securities Corporation "are regularly engaged in selling, purchasing, or transmitting some electric energy across state lines"; and that Utah Power & Light Company and Pacific Power & Light Company are both holding companies and electric-utility companies and that the transmission of electric energy across state lines is part of the enterprise of each.

In the light of the findings supported by the stipulation, we perceive no ground for a conclusion that the defendant companies which are enjoined are not engaged in activities within the reach of the congressional power.

*Second.* Challenging the validity of the Act in its entirety, petitioners contend that §§ 4 (a) and 5 cannot be separated from the other provisions of the Act and thus be separately sustained and enforced. They urge that these sections are purely auxiliary to the subsequent or "control provisions" of the Act (§§ 6 to 13); that the

object of this suit is to compel submission to an integrated system of control and that the sole question is whether the Act as a whole, "or enough to accomplish its general plan," is constitutional. They insist that this question must be determined before they may be compelled to register.

(1) In this branch of the case, petitioners address their argument to the *intent* of Congress, rather than to its *power*. But Congress has defined its intent as to separability. Section 32 of the Act provides:

"If any provision of this title [4] or the application of such provision to any person or circumstances shall be held invalid, the remainder of the title and the application of such provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby."

This provision reverses the presumption of inseparability—that the legislature intended the Act to be effective as an entirety or not at all. Congress has established the opposite presumption of divisibility. *Williams* v. *Standard Oil Co.*, 278 U. S. 235, 242; *Utah Power & Light Co.* v. *Pfost*, 286 U. S. 165, 184; *Champlin Refining Co.* v. *Corporation Commission*, 286 U. S. 210, 235. Congress has thus said that the statute is not an integrated whole, which as such must be sustained or held invalid. On the contrary, when validity is in question, divisibility and not integration is the guiding principle. Invalid parts are to be excised and the remainder enforced. When we are seeking to ascertain the congressional purpose, we must give heed to this explicit declaration.

(2) It is evident that the provisions of §§ 4 (a) and 5 are not so interwoven with the other provisions of the

---

[4] The "title" is "Title I—Control of Public-Utility Holding Companies."

Act that there is any inherent or practical difficulty in the separation and independent enforcement of the former while reserving all questions as to the validity of the latter. The administrative construction of the statute was formulated in that view. Rule 4 of the Commission provided that any person, in filing any statement under the Act, might include an express reservation of constitutional and legal rights. It was on the basis of that construction that this suit was prosecuted and was limited to the enforcement of §§ 4 (a) and 5. All rights and remedies as to all other provisions of the Act are, as we have seen, expressly reserved to the defendants by the decree. Nor can it be said that this reservation is illusory. If this decree is affirmed, it will constitute a specific adjudication that registration will be without prejudice to future challenge of the validity of any provision of the Act, or requirement of the Commission, outside of §§ 4 (a) and 5. It is idle to contend that registration pursuant to the decree will subject the defendants to the Act as an integrated whole or bring into operation against them what the decree expressly excludes.

(3) Although there is no practical obstacle to the separate enforcement of the provisions of §§ 4 (a) and 5, the argument is pressed that in reason and design there is an essential unity of these provisions and the so-called "control provisions" which forbids such enforcement. Petitioners urge that §§ 4 (a) and 5 "merely implement the system of controls"; that the policy of the Act as declared in § 1 (c) is to compel "the simplification and the elimination of holding company systems"; and that the objective cannot be attained by informatory processes but only by such regulation or control as will "eliminate" the evils.

The Government replies that while the other provisions are applicable only to registered companies and their subsidiaries, §§ 4 (a) and 5 are drafted so as to be opera-

tive independently and that the registration provisions themselves constitute "an effective instrument of informatory regulation." "If, for example," argues the Government, "section 11 dealing with corporate reorganizations were adjudged invalid, there is no inherent reason why the other regulatory provisions could not be enforced as the Congress provided. And if section 13 dealing with service contracts were adjudged invalid, there is no inherent reason why the registration provisions, or sections 6 and 7 regulating security issues, or sections 8, 9 and 10 dealing with utility acquisitions, could not be administered in accordance with their terms." "Likewise," it is said, "the purpose and effect of the registration provision—regulation by the informatory process—are the same whether registration is considered as a separate statute regulating utility holding companies, or as but one part of a comprehensive statute containing many different regulations of utility holding companies." Moreover, as observed by the District Court, § 1 (c) in its entirety negatives any conclusion that the simplification and elimination of holding companies "is the sole policy or the whole end and object of the Act, which, as stated, is 'to meet the problems and eliminate the evils, as enumerated in this section, connected with public utility holding companies,' " and thus "simplification and elimination" are but a means and not "the exclusive means" deemed to be essential for the purpose of effectuating such policy "in whole or insofar as may be constitutionally possible."

We think that the manner in which the Act is framed and the variety of provisions it contains, when viewed in the light of the presumption of divisibility, justify that conclusion. The fact that registration underlies the application of subsequent requirements of the statute does not prevent the provisions of §§ 4 (a) and 5 from having a purpose and a value of their own. Section 5 not only

provides in paragraph (a) for the filing of a "notification of registration" but also requires by paragraph (b) every registered holding company to submit, within a reasonable time after registration, a "registration statement" containing a variety of detailed information as to corporate structure and activities. Thus § 5 (b) is itself a "control" provision, which is immediately operative. The duty to supply the described information is separately and definitely prescribed.

It cannot be denied that a requirement of this sort is a regulation which Congress could have regarded as important in itself and could have made the subject of a separate statute. The fact that it is found in a statute imposing other regulations, or that it precedes the application of the others, does not deprive it of its essential character and its capacity to stand alone. Regulation requiring the submission of information is a familiar category. Information bearing upon activities which are within the range of congressional power may be sought not only by congressional investigation as an aid to appropriate legislation, but through the continuous supervision of an administrative body. See *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 474; *Interstate Commerce Commission* v. *Goodrich Transit Co.,* 224 U. S. 194, 211; *American Telephone & Telegraph Co.* v. *United States,* 299 U. S. 232, 235, 237. Congress may use this method in connection with a comprehensive scheme of regulation, as, for example, in the case of the Interstate Commerce Commission and the Federal Communications Commission; or Congress may employ this informatory process independently. An illustration of the latter is found in the statute relating to newspapers and periodicals, enjoying the privileges accorded to second class mail, which requires an annual statement setting forth the names and addresses of the editor, publisher, business manager, owner, and, in case of ownership by a

corporation, the stockholders, and also the names of known bondholders or other security holders, together with a statement as to circulation. 39 U. S. C. 233. See *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288.

Petitioners refer to the limitations upon publicity contained in § 22 and contrast this provision with that of the Securities Act of 1933, § 6 (d), 48 Stat. 74, 78. But § 22 provides that the information shall be available to the public when in the judgment of the Commission its disclosure would be in the public interest or the interest of investors or consumers. The limitations are plainly intended to safeguard particular information which may be regarded as of a private or confidential character and as not directly concerning the public interest. They do not detract from the value which may be deemed to attach to the requirement that the described information should be furnished, whether as an aid to legislation or as facilitating administrative supervision or as securing a desirable publicity.

Both parties invoke the legislative history of the Act. Petitioners contend that this shows that control, not publicity, was intended. The Government insists that the legislative history supports the presumption of separability. It is unnecessary to review the details of the arguments or the cited statements from the legislative halls. The Act speaks for itself with sufficient clarity. The Government points to six groups of regulatory provisions contained in the Act, viz., registration (§§ 4 and 5); issuance of securities (§§ 6 and 7); acquisition of securities and utility assets (§§ 8, 9 and 10); corporate simplification and reorganization (§ 11); service contracts and other inter-company transactions (§§ 12 and 13); and reports and accounts (§§ 14 and 15). We see nothing in the legislative history of the Act which requires the conclusion that all these groups were intended to constitute a unitary system, no part of which can fail without destroying the

rest. On the contrary, we think that the intent of Congress is that these various groups of regulations, as well as particular provisions of each group, should be regarded as separable so that, if any such group or provision should be found to be invalid, that invalidity should not extend to the remaining parts if by reason of their nature and as a practical matter they could be separately sustained and enforced.

Congress provided in § 18 (f) that the Commission might bring an action to enforce compliance with the Act or any rule, regulation or order thereunder, and that upon a proper showing a permanent or temporary injunction or decree should be granted. In pursuance of that authority, the present action was brought solely to enforce the provisions of §§ 4 (a) and 5. We find no basis for holding that these provisions cannot be separately enforced if they are valid and we turn to that question. In view of this conclusion as to separability, it is unnecessary to go through the statute in order to determine whether other provisions are valid or invalid, and we do not intimate that there would not be found in any event a workable system in addition to the registration sections.

*Third.* Petitioners contend that, standing by themselves, §§ 4 (a) and 5 transgress constitutional restrictions. These sections have three parts. Section 5 (a) provides for the filing of a notification of registration. Section 5 (b) makes it the duty of every registered holding company to file a registration statement, with documents and certain detailed information, within a reasonable time after registration. Section 4 (a) prescribes the penalty for failure to register under § 5. As the requirement of information is in itself a permissible and useful type of regulation (*Interstate Commerce Commission* v. *Brimson, supra; Interstate Commerce Commission* v. *Goodrich Transit Co., supra; American Telephone & Telegraph Co.* v. *United States, supra*), the question is whether the par-

ticular demand, here assailed, can be validly addressed to the defendants enjoined by the decree, and, if so, whether it exceeds constitutional limits because of the character and extent of the information sought.

The findings of the District Court based upon the stipulation of facts leave no room for doubt that these defendants are engaged in transactions in interstate commerce. That they conduct such transactions through the instrumentality of subsidiaries cannot avail to remove them from the reach of the federal power. It is the substance of what they do, and not the form in which they clothe their transactions, which must afford the test. The constitutional authority confided to Congress could not be maintained if it were deemed to depend upon the mere modal arrangements of those seeking to escape its exercise. Compare *Northern Securities Co.* v. *United States,* 193 U. S. 197. We need not now determine to what precise extent these defendants are actually engaged in interstate commerce. It is enough that they do have continuous and extensive operations in that commerce, and Congress cannot be denied the power to demand the information which would furnish a guide to the regulation necessary or appropriate in the national interest. Regulation is addressed to practices which appear to need supervision, correction or control. And to determine what regulation is essential or suitable, Congress is entitled to consider and to estimate whatever evils exist.

Congress has set forth in the Act what it considers to be the factual situation and the need of federal supervision. The following statement is found in paragraph (a) of § 1:

"Public-utility holding companies and their subsidiary companies are affected with a national public interest in that, among other things, (1) their securities are widely marketed and distributed by means of the mails and instrumentalities of interstate commerce and are sold to a

large number of investors in different States; (2) their service, sales, construction, and other contracts and arrangements are often made and performed by means of the mails and instrumentalities of interstate commerce; (3) their subsidiary public-utility companies often sell and transport gas and electric energy by the use of means and instrumentalities of interstate commerce; (4) their practices in respect of and control over subsidiary companies often materially affect the interstate commerce in which those companies engage; (5) their activities extending over many States are not susceptible of effective control by any State and make difficult, if not impossible, effective State regulation of public-utility companies."

Congress has further declared in paragraph (b) of that section, upon the basis of facts disclosed by the reports of the Federal Trade Commission and of the Committee on Interstate and Foreign Commerce of the House of Representatives, and otherwise ascertained, the circumstances in which the national interest and the interest of investors and consumers may be adversely affected by the operation of public utility holding companies. And after this catalogue of the abuses which may exist in the circumstances described, Congress declares it to be its policy "to meet the problems and eliminate the evils as enumerated in this section, connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce." Without attempting to state the limits of permissible regulation in the execution of this declared policy, we have no reason to doubt that from these defendants, with their highly important relation to interstate commerce and the national economy, Congress was entitled to demand the fullest information as to organization, financial structure and all the activities which could have any bearing upon the exercise of congressional authority. The regulation found in § 5 (b)

goes no further than to require this information and we are of the opinion that its validity must be sustained.

Section 4 (a) prescribes the penalty for failure to register under § 5, and that section as an incident to registration imposes the duty to file the described registration statement. Treating the requirements of §§ 4 (a) and 5 as a separable part of the Act, the question is whether that penalty may be validly imposed.

In the imposition of penalties for the violation of its rules, Congress has a wide discretion. Sanctions may be of various types. See *Helvering* v. *Mitchell, ante,* p. 391. They may involve the loss of a privilege which would otherwise be enjoyed. *Id.* Note 2. When Congress lays down a valid rule to govern those engaged in transactions in interstate commerce, Congress may deny to those who violate the rule the right to engage in such transactions. *Champion* v. *Ames,* 188 U. S. 321; *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 415; *Brooks* v. *United States,* 267 U. S. 432, 436, 437; *Gooch* v. *United States,* 297 U. S. 124; *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.,* 299 U. S. 334, 346, 347. And while Congress may not exercise its control over the mails to enforce a requirement which lies outside its constitutional province, when Congress lays down a valid regulation pertinent to the use of the mails, it may withdraw the privilege of that use from those who disobey. *Champion* v. *Ames, supra; Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288.

In the instant case, the penalty attaches to the use of the instrumentalities of commerce and of the mails by those who, engaged in that use, refuse to submit to § 5 and thus through registration and the statement which is incident to registration to supply the information which Congress is entitled to demand, and has demanded, with respect to their organization and practices. Each one of the paragraphs of § 4 (a), as related to the requirements of § 5, is addressed to those in that class. We think

that the imposition of such a penalty does not transgress any constitutional provision.

The decree enforces this penalty by injunction as the Act itself authorizes. § 18 (f). The terms of the injunction follow closely the provisions of § 4 (a) and do not extend beyond them. To escape the penalty and the enforcing provisions of the decree, all that the defendants have to do is to register with the Commission and assume, under § 5, the obligation to file the described registration statement. All their rights and remedies with respect to other provisions of the statute remain without prejudice. Their objections to the affirmative provisions of the decree are untenable.

*Fourth.* The District Court did not err in dismissing the cross bill. Defendants are not entitled to invoke the Federal Declaratory Judgment Act in order to obtain an advisory decree upon a hypothetical state of facts. See *New Jersey* v. *Sargent,* 269 U. S. 328; *United States* v. *West Virginia,* 295 U. S. 463; *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 324; *Anniston Manufacturing Co.* v. *Davis,* 301 U. S. 337, 355. By the cross bill, defendants seek a judgment that each and every provision of the Act is unconstitutional. It presents a variety of hypothetical controversies which may never become real. We are invited to enter into a speculative inquiry for the purpose of condemning statutory provisions the effect of which in concrete situations, not yet developed, cannot now be definitely perceived. We must decline that invitation. *Anniston Manufacturing Co.* v. *Davis, supra.*

The decree is

*Affirmed.*

Mr. Justice McReynolds dissents.

Mr. Justice Cardozo and Mr. Justice Reed took no part in the consideration and decision of this case.