### MURPHY v. NORTH AMERICAN CO. et al.
### WALTERS et al. v. SAME.

District Court, S. D. New York.

Aug. 27, 1938.

William M. Dederick, of New York City (Max Berkow, Louis Braun, and Edward B. Margolies, all of New York City, of counsel), for plaintiff John H. Murphy.

Lawrence R. Condon, of New York City (Robert T. Woodruff and Osborne A. McKegney, both of New York City, of counsel), for plaintiffs John W. and Helen D. Walters.

Sullivan & Cromwell, of New York City (John Foster Dulles and John C. Bruton, Jr., both of New York City, of counsel), for defendant North American Co.

Hodges, Reavis, Pantaleoni & Downey, of New York City (Francis X. Downey, of New York City, of counsel), for defendant North American Light & Power Co.

WOOLSEY, District Judge.

My decision herein is in favor of the plaintiffs who may have decrees for the relief hereinafter indicated.

■ I. The plaintiffs in the two suits are citizens and residents of the State of New York. The North American Light & Power Company, hereinafter called the Power Company, is a corporation of Delaware. The North American Company, hereinafter called North American, is a corporation of New Jersey.

The matter in the controversy between the parties, exceeds, exclusive of interest and costs, the sum or value of $3,000.

These facts give me subject matter jurisdiction of these causes under Title 28, United States Code, Section 41 (1) (c), 28 U.S.C.A. § 41 (1) (c).

II. These two causes have been tried together on agreed statements of facts which are substantially the same.

The only issue of importance between the parties hereto involves the proper construction to be put on a written contract between the Power Company and North American made and dated March 27, 1931. This contract does not state where it was executed, but at my suggestion, in order to meet any questions of the law applicable thereto which might arise by reason of the decision of the Supreme Court on April 25, 1938, in Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, the parties agreed at the trial that it "shall be deemed to have been made in the State of New York."

III. In March, 1931, North American and Middle West Utilities each owned 43% of the common stock—then the only voting stock—of the Power Company.

It is common ground that the Power Company, for reasons unnecessary here to consider, was at that time in need of capital financing to the extent of $10,000,000. It was found that marketwise this would not be feasible unless North American and Middle West Utilities put their credit behind any securities which the Power Company might try to sell through bankers to the public.

Accordingly on March 27, 1931, a contract—hereinafter often referred to as the Contract—was entered into between North American and Middle West Utilities Company on the one side and the Power Company on the other side under which the Power Company agreed to make an annual offering to its common stockholders of record on March 5, in each year, of a sufficient number of shares of its common stock to produce $2,000,000 in each of the years 1932 to 1936 inclusive, with which to meet corresponding Serial Note maturities in such years, at a price per share equal to approximately 75% of its average closing price on the Chicago Stock Exchange for the last ten trading days next preceding March 1 in each respective year, and North American and Middle West jointly and severally agreed to purchase for cash between March 26 and March 30 of each year at the respective offering prices the shares so offered which were not taken up by the stockholders of the Power Company.

The $2,000,000 of serial notes, thus arranged to be met annually, constituted 20% of an aggregate issue of notes in the sum of $10,000,000 which the Power Company intended to sell.

The maturity dates of these notes and the interest thereon were to be as follows:

| Amount | Annual Interest Rate | Maturity Date |
|---|---|---|
| $2,000,000 | 4½% | April 1, 1932 |
| $2,000,000 | 5% | April 1, 1933 |
| $2,000,000 | 5% | April 1, 1934 |
| $2,000,000 | 5% | April 1, 1935 |
| $2,000,000 | 5% | April 1, 1936 |

The Power Company, thus financially ensured, in its turn made on March 30, 1931, an agreement to sell this $10,000,000 issue of notes to a syndicate composed of E. H. Rollins & Sons Incorporated and others, under the following terms and conditions—inter alia:

(1) The Serial Notes would be issued under a Trust Agreement to be dated April 1, 1931 to Central Trust Company of Illinois, as Trustee; (2) prior to the execution and delivery of the Trust Agreement the Power Company would enter into a written

agreement with Middle West Utilities Company and the North American Company with respect to the offering and sale by the Power Company of shares of its common stock to its common stockholders, for the purpose of insuring that the Power Company would have available sufficient funds for the retirement of Serial Notes as they matured; and (3) the Power Company would assign to Central Trust Company of Illinois, as Trustee under said Trust Agreement, its right to the proceeds resulting from the issue· and sale of shares of its common stock pursuant to the agreement with North American and Middle West. These terms and conditions were duly performed and the Serial Notes were offered for sale on or about April 1, 1931. Delivery was made on April 15, 1931.

IV. The provisions of the above mentioned contract of March 27, 1931, material to the inquiries made necessary by the issues raised in these two causes are as follows (italics mine):

"1. *The Power Company* agrees that it *will annually offer to its common stockholders* of record on the fifth day of March in each of the years, from the year 1932 to the year 1936, both inclusive, *the right and privilege of purchasing* (ratably according to their respective common stock holdings) an aggregate amount of the then unissued *common stock of the Power Company which, computed at the offering price (determined as hereinafter provided), will suffice to produce in each of said years a cash sum of at lease two million dollars;* provided, however, that the Power Company may at its option at any time offer to its common stockholders, in lieu of shares of unissued common stock, shares of common stock then in its treasury or otherwise acquired or provided for such purpose.

"The price per share at which such common stock shall be so offered to the common stockholders of the Power Company, as provided in this paragraph numbered 1, shall be that number of *whole* dollars which shall most nearly equal (and for this purpose a fraction of one-half shall be treated as less than one-half) seventy-five per centum (75%) of the average closing price per share of the common stock of the Power Company on the Chicago Stock Exchange averaged for the last ten trading days next preceding March 1st in each respective year in which such offer of common stock is made to the common stockholders. * * *

"2. Such *offering* to the common stockholders of the Power Company shall be for cash, and *shall be open for acceptance* and payment *by such stockholders to and including March 25th* next following the date on which such offer is made by the Power Company.

"3. *Middle West Company and the North American Company jointly and severally agree with the Power Company that Middle West Company and the North American Company will between the dates March 26th and March 30th, both inclusive, of each year, from the year 1932 to the year 1936, both inclusive, purchase for cash at the respective offering prices at which the common stock mentioned in paragraph 2 hereof next preceding shall have been offered to the common stockholders of the Power Company, all shares of the common stock of the Power Company so offered which shall not have been purchased by its common stockholders on or before March 25th in each respective year; * * ** 

"*The Power Company agrees that it will issue, sell, and deliver its shares of common stock to its common stockholders and/or to Middle West Company and the North American Company* (or their respective nominees) *purchased by them respectively, pursuant hereto, and will take all steps necessary or appropriate to this end.* For this purpose the Power Company has reserved and agrees that it will keep reserved (except as sales and deliveries are made therefrom) 250,000 shares of its now unissued common stock.

"4. * * * *The Power Company shall also be* privileged at any time to increase the amount of its *authorized common stock.*

"5. *If at any time it shall become legally impossible for the Power Company* to offer for sale and/or to sell and deliver sufficient shares of its common stock to provide funds sufficient to retire all of the notes of said issue as the same respectively mature, as contemplated by this Agreement, *then and in that event* Middle West Company and the North American Company jointly and severally agree with the Power Company *that they will upon the maturity of such notes purchase for cash at par, plus accrued interest, such of said notes as shall not have been retired by the application of the proceeds* of the sale of common stock of the Power Company as herein provided."

The agreement of March 27, 1931, was assigned to the Trustee under the Note In-

denture at the time of the delivery of the Serial Notes on April 15, 1931. The original copy of the agreement of March 27, 1931 was executed and delivered to the Power Company on March 30, 1931.

V. Shortly after the contract was made the parties thereto expressed their views in writing as to the construction thereof. I do not regard their views as of importance but mention the fact because it was referred to in the stipulation and on the argument.

What happened was that the President of the Power Company, in response to a request of the President of Middle West Utilities Company, sent to the latter and to North American a letter dated April 7, 1931, stating therein that according to his understanding the term *"legally impossible"* contained in paragraph 5 of the contract related *"to conditions beyond the control of the officers and directors of this Company"*, and also that the Power Company was required, if there should be insufficient authorized and unissued stock to take all action "necessary or proper to endeavor to make available" sufficient common stock.

The letter was submitted by North American to counsel, who stated that he did not "see anything wrong in the explanatory letter", and that "legal impossibilities might be failure of stockholders vote, bankruptcy or involuntary dissolution, or court decree preventing an increase, etc." North American accordingly replied to the Power Company that it had "no suggestions to offer with respect to the letter of explanation:"

Thus the matter was left with the rights of the parties based on the contract without amendment or supplement.

VI. On April 15, 1932, the Middle West Utilities Company went into reorganization under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. Later its trustees disaffirmed the Contract which the Middle West Utilities Company had never performed. Consequently there will not be any further reference herein to the Middle West Utilities Company.

VII. The gravamen of the complaint in these causes is that in the years 1935 and 1936 instead of purchasing common stock of the Power Company, the North American which then owned 73% of the common stock thereof insisted on lending it $2,000,000 in each of those years, that, consequently, instead of increasing its stockholdings in the Power Company, it became a creditor and thus achieved a status of priority over the preferred stockholders thereof not only in respect of possible future reorganization or liquidation of the Power Company but also as to its current income.

The problem involved in these causes is whether, by reason of the circumstances under which the Contract came to be performed or of the terms contained in it, North American can excuse its failure to buy $2,000,000 worth of common stock in 1935 and 1936.

VIII. At the time of the contract of March 27, 1931, the market price of Power Company stock was approximately $70, but, as will be hereinafter indicated, it decreased much in the years covered by the contract, 1932–1936.

The result was that, as the constant element in the situation, namely, the requirement for payment of $2,000,000 yearly in cash by North American to the Power Company in order that it might meet its maturing serial notes, remained inexorable, and as the other common stockholders of the Power Company were not as hospitable to the exercise of their preemptive rights as had been hoped, North American had to purchase more shares of the stock off the Power Company than had been expected.

A chronological summary of the situation involved from year to year follows:

A. In 1932, when the offering to stockholders was to be made, the market price of Power Company shares was about $15; North American waived the provision of paragraph 1 of the Contract for an offering at 75% of market price, and the offering to stockholders was made at $15. 166 shares were purchased by the stockholders generally, and 133,168 by North American.

B. In 1933 the price according to the formula in paragraph 1 of the Contract was $2; the certificate of incorporation was amended, and one million new shares were issued, of which 107,870 were subscribed for by the shareholders and the balance of the issue by North American.

C. By 1934 the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., had been enacted and an offering to stockholders would have entailed considerable expense. At a stockholders' meeting on March 28, 1934, when the preferred stockholders had a vote, 126,360 shares of preferred stock were represented, and resolutions were adopted by the holders of a majority of each class of stock to amend the certificate of incorporation of the Power Company so as to increase the

total number of authorized shares of common stock to 3,625,000, and to change the authorized common stock (both issued and unissued) without par value into the same number of shares of common stock of the par value of $1 per share.

North American waived the Contract requirement of an offering to stockholders. A majority of other stockholders waived their preemptive rights and North American purchased at private sale enough shares to give to the Power Company $2,000,000. The price of $2.40 paid per share was the market price and not the formula price.

D. In 1935, one of the years now in controversy, when the first breach of the Contract is alleged to have occurred, the Public Utility Holding Company Act, 15 U.S.C.A. § 79 et seq. was in course of enactment by Congress, and the market for utility shares was virtually nonexistent. The market price of the Power Company's common stock was then 62½ cents; 75% of 62½ cents is, as I calculate it, 46.875.

The application of the formula would have required an offering at one dollar ($1) which was *"that number of whole dollars"* which most nearly equalled seventy-five per centum of the price as it was fixed under paragraph 1 of the Contract. To buy stock at this price of one dollar ($1), which was so much in excess of the market price would, of course, have been a hardship for North American, and would have been wholly unacceptable to the other stockholders of the Power Company.

The formula price, however, coincided with the par value of one dollar ($1) per share as established in 1934, and consequently the par value did not in any way interfere with the use of the formula price for the sale of stock by the Power Company.

In order to have an offering to stockholders it was necessary (1) to have an increase in the authorized stock, (2) to make registration with the Securities Exchange Commission for the new stock, and (3) to secure the Commission's consent to the issue.

Prior to April 1, 1935, North American, in spite of paragraph 4 of the Contract which gave the Power Company the privilege to increase its common stock at any time, refused to vote such stock as it then owned—then 73% of the common stock outstanding—in favor of the necessary increase, notified the Power Company that it did not consider itself bound to take the stock, and offered to advance funds in the sum of $2,000,000 to meet the notes maturing on April 1, 1935, and to receive in exchange the promissory note of the Power Company bearing 5% interest.

The Power Company, which had not control of the situation, perforce accepted the advance and gave its note therefor, under an agreement that its so doing should be without prejudice to its rights under the Contract of March 27, 1931.

E. In 1936, due to an amendment of its certificate of incorporation in August 1935 the Power Company had sufficient authorized common stock to make delivery under the Contract, and the market price had risen so that the formula price was $3.

The Public Utility Holding Company Act had been enacted by Congress, and both companies had suits pending to test its constitutionality.

North American again refused to perform, and again the Power Company accepted an advance of $2,000,000 without prejudice to its\rights under the contract, and gave its note therefor.

F. The interest paid to North American on the notes has been held by it in a separate account to await determination of the controversy submitted to me herein.

If North American was not obligated to take stock, no point is to be made that it advanced money to the Power Company instead of purchasing the 1935 and 1936 Serial Notes on maturity as required under the so-called "alternative method of performance" provisions of the first paragraph of the Contract. Indeed the variance, therefrom, was immaterial, and made not the slightest difference to the Power Company or its stockholders.

G. The trust agreement under which the Serial Notes were issued was satisfied and discharged on April 17, 1936.

H. Payment of the two promissory notes of 1935 and 1936 in the face amount of $2,000,000 each, given by the Power Company to North American, has been extended pendente lite, with interest continuing at the rate of 5% per annum.

IX. There is not any dispute as to the performance of the Contract in 1932, 1933, and 1934. In 1935 and 1936, however, North American contends that by reason of the situation in those years, it was only bound to the "alternative method of performance."

478

Paragraph 5 of the Contract did not, however, give North American an optional "alternative method of performance" but an alternative predicated on a condition precedent, namely, that it must have become "legally impossible" for the Power Company to perform its part of the contract by the sale and delivery of enough of its common stock to meet the measure set by the contract. As North American was absolutely bound, failing this condition, to take annually $2,000,000 worth of Power Company common stock the burden falls on it to justify its recourse to the "alternative method of performance" in 1935 and 1936. For if there be any exception excusing performance of a contract in certain circumstances, the party claiming to be excused must bring itself within the exception and show that the exception operated on the Contract and excused his performance thereof. W. R. Grace & Co. v. Luckenbach S. S. Co. et al., D.C., 248 F. 953; Luckenbach S. S. Co. v. W. R. Grace & Co., 4 Cir., 267 F. 676, 679, 680, certiorari denied 254 U.S. 644, 41 S.Ct. 14, 65 L.Ed. 454.

A. As to the year 1935, North American puts forward several reasons which according to its contentions show that it was "legally impossible" for the Power Company to perform.

1. First, it says that there was insufficient authorized and unissued stock.

If, for example, it had been illegal under the laws of Delaware, where it was incorporated, for the Power Company to issue more stock than it had outstanding in 1935, this contention would be sound. But a complete answer thereto is that the Power Company was, for its part, ready, able, and willing to take steps to make the required increase of its stock but was prevented from so doing solely by North American—its controlling stockholder—which refused to vote its stock in favor of such increase.

A party to a contract is under an implied obligation to cooperate in its performance, and cannot take advantage of an obstacle to performance which it has created or which lies within its power to remove. Cf. Patterson v. Meyerhofer, 204 N.Y. 96, 97 N.E. 472; Williston on Contracts (rev.ed.) Section 887A; Restatement of Contracts, Section 395.

North American conceded, as it must, the existence of this principle, but argues that the question here is not of its having created the obstacle which made performance by the Power Company impossible, but

of its refraining from recreating a possibility of performance which had ceased to exist due to the sale and issue of all the Power Company's authorized stock.

This ingenious contention does not help North American, for legal impossibility of performance by the Power Company could not exist so long as it was within the power of North American to remove the obstacle to performance.

2. North American further claims that performance by the Power Company was impossible in 1935 because the price formula was not applicable to the situation then existing. As is shown above, the market price of the Power Company's common stock was then 62½ cents, of which 75% is 46.875 cents.

It is argued that all the terms of the price formula of paragraph 1 of the Contract could not then be applied, because either a price of zero would result or the phrase in parenthesis—"for this purpose a fraction of one half shall be treated as if less than one half"—must be disregarded.

I do not agree.

I think that the parenthetical clause just quoted—in order to make sense—must mean that the fraction one-half shall be treated as if less than one-half. Thus construed it would take care of a situation wherein the formula price as calculated was, for example, $4.50, which would make the offering price in that situation $4, because $4 would be the nearest *whole* dollar to the price calculated on the basis of the formula taking the parenthetical clause into consideration.

In the instant cause one dollar is the nearest *whole* dollar to 46.875 cents, the price calculated under the formula. That fixes the offering price herein for 1935.

It may be conceded—and this is defendant's real argument—that the parties did not contemplate the situation which actually occurred, but expected that the formula price would be less than the market price, and that the offerings of stock, therefore, would be reasonably attractive to other shareholders of the Power Company.

3. The requirement of Delaware law that stock of a par value of one dollar ($1) must, if sold for cash, be sold for one dollar ($1), and the fact that a par value of one dollar ($1) had been fixed for the Power Company's stock in 1934, does not, as above indicated, affect the situation for the par value price and the formula price happened here to coincide.

4. The fact that an offering would have been illegal in 1935 without registration under the Securities Act of 1933 plainly did not create legal impossibility, at least until registration had been attempted and refused by the Commission. Not making such an attempt merely showed negligent failure to prepare for expectable eventualities. Cf. Cheatham v. Wheeling & Lake Erie R. Co., 37 F.2d 593, D.C.S.D.N.Y.

5. In what is commonly called the doctrine of frustration of contract due to impossibility of performance, impossibility is not, as it is in paragraph 5 of the Contract herein, limited to legal impossibility only— e. g. The Tornado, 108 U.S. 342, 349, 2 S. Ct. 746, 27 L.Ed. 747, Spalding v. Rosa, 71 N.Y. 40, 27 Am.Rep. 7, and Robinson v. Davison (1871) L.R. 6 Exch. 269—although nowadays that is perhaps the most frequent type of impossibility invoked.

The doctrine of frustration has its origin in equitable principles, and, it seems to me that a good method of testing each defence based on that doctrine is to consider whether, if law and equity were administered, as of old, in wholly separate courts, a chancellor, by reason of what happened, would have enjoined as unjust the enforcement of a judgment secured at law under the letter of the contract. I always applied this test and found it satisfactory in the frustration cases which I had, as counsel, during and just after the Great War.

In the usual cases of claimed frustration of contract, the contracts involved do not mention impossibility of performance as an excuse. The contract involved herein, however, is unusual, in that it not only mentions impossibility of performance by the Power Company, but makes it a ground not for dissolution of the Contract but merely for a change in the method of the performance thereof on the part of North American.

The question of what constitutes legal impossibility, however, is the same herein as in the usual frustration case where such impossibility is relied on, as for example, Texas Company v. Hogarth Shipping Corporation, 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123, wherein the Supreme Court held that a voyage charter party of a British steamship was frustrated by the requisition thereof by the British Government, and Mr. Justice Van Devanter, at pages 629, 630, 41 S.Ct. at page 614, admirably summarized the doctrine of frustration.

6. In the instant cause North American has not made out legal impossibility of performance by the Power Company in 1935.

On the contrary such obstacles to performance as were encountered by the Power Company were due solely to North American's acts, which, in spite of its control of the Power Company stock, do not constitute the force majeure always required to create legal impossibility, Columbus Ry., Power & Light Co. v. Columbus, 249 U.S. 399, 414, 39 S.Ct. 349, 63 L.Ed. 669, 6 A.L.R. 1648, and of which it would be highly inequitable to allow North American to take advantage. Cf. Patterson v. Meyerhofer, 204 N.Y. 96, 97 N.E. 472.

Consequently, in 1935 North American's position as to its right to adopt the "alternative method of performance" prescribed by paragraph 5 of the Contract cannot be justified.

B. In the year 1936, the reasons offered for the existence of legal impossibility in 1935—i. e. insufficient authorized and unissued stock and an inapplicability of the price formula—are not involved.

1. North American relies as to this year entirely on alleged legal impossibility of performance by the Power Company arising from the existence of the Public Utility Holding Company Act of 1935, under which it was illegal, after December 1, 1935, for any unregistered holding company to make a public offering of its stock.

North American and the Power Company declined to register under the said Act, considering that to do so might prejudice their rights in contesting the constitutionality thereof.

Thus the impossibility was not a legal impossibility but was created by the parties and is unavailing as a defense herein.

However undesirable or inadvisable registration under the Act may have seemed to public utility companies, the existence of the Act itself did not make performance of the Contract by the Power Company legally impossible, any more than did the necessity of registering with the Securities and Exchange Commission in order to make an offering of stock in 1935. See cases cited above.

2. I am not called on to determine the question whether the North American and the Power Company exercised sound judgment in refraining from registration. Nor am I called on to decide various other issues discussed by counsel, such as whether the

Power Company is a holding company within the statutory definition, or whether the Securities Exchange Commission on proper application would have approved an offering of its stock.

I have not overlooked any argument advanced on behalf of North American, but those which I have not mentioned are not, in my opinion, sufficiently persuasive even to require discussion.

C. It has not been argued by North American that there was any waiver by the Power Company of its rights under the Contract. Such an argument would not, of course, be maintainable because it was agreed between it and the Power Company that action to determine their respective rights under the Contract should be deferred pending determination of the validity of the Public Utility Holding Company Act.

X. It follows that North American has not any legal excuse for not having purchased common stock of the Power Company as provided by the primary obligation of the Contract, and that the plaintiffs in these causes are entitled to decrees.

XI. After the decision on January 29, 1937, by Judge Mack, sitting in this Court, in Securities and Exchange Commission v. Electric Bond & Share Company, 18 F. Supp. 131, both parties registered under the Public Utility Holding Company Act— North American on February 25, 1937, and the Power Company on March 10, 1937.

On November 8, 1937, the Circuit Court of Appeals for this Circuit affirmed Judge Mack's decision, 2 Cir., 92 F.2d 580, and on March 28, 1938, that court was in turn affirmed by the Supreme Court. Electric Bond & Share Co. v. Securities and Exchange Commission, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105.

Further proceedings by the parties in pursuance of the Public Utility Holding Company Act are accordingly expectable.

XII. I do not see how damages could be assessed as the situation now stands. Consequently there will not be any reference for an accounting under an interlocutory decree.

It is too late now to grant specific performance according to the terms of the Contract which included an offering of stock to all common stockholders.

But as North American was wholly responsible for the failure of the Power Company in 1935 and 1936 to make such an offering, North American must, I think, be deemed to have waived that term of the Contract, and cannot properly complain if it be required so to reconstruct the situation that its failure to perform its primary obligation under the Contract—to buy common stock of the Power Company not taken by other shareholders—will be cured, and that it will be demoted from its present role as creditor of the Power Company for $4,000,000 to its agreed role as stockholder thereof.

Having regard to the waiver just mentioned, based on the 1935 formula price of $1 per share, as above calculated, North American should have taken 2,000,000 shares of the Power Company's common stock in 1935, and, based upon the 1936 formula price of $3 per share, North American should have taken 666,667 shares thereof in 1936.

This makes a total of 2,666,667 shares in exchange for which I find North American should surrender not only the two notes of the Power Company which it now holds, dated April 1, 1935, and April 1, 1936, respectively, aggregating $4,000,000 in principal amount, but also any interest on said notes or renewals thereof which may have been paid to it by the Power Company.

XIII. The remedy to be applied herein has some perplexing aspects.

Except that it is expectable that both the Power Company and North American may hereafter become involved in administrative proceedings under the Public Utility Holding Company Act, it does not seem to me that there would be any ground whatever for a declaratory judgment or decree on the contract rights of the parties, for such procedure necessarily looks to future performance of the contract, and, indeed, need not involve more than a declaration of rights thereunder. Aetna Life Insurance Company v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617, 108 A.L.R. 1000. But here the contract has been broken, and the time for performance is long since past. The remedy to be granted, therefore, involves an attempt to cure a past wrong, not to provide a prophylaxis for the continuing performance of a contract.

The remedy to be given is, insofar as possible, a reconstruction of the situation which should have existed if the contract— subject to the waiver just mentioned—had otherwise been properly performed. A remedy based on this principle was approved in a controversy regarding a reorganization in Southern Pacific Co. v. Bogert, 250

U.S. 483, 492–498, 39 S.Ct. 533, 63 L.Ed. 1099, wherein, as here, the majority stockholder in a company disregarded the rights of other stockholders and sought an advantage to which it was not entitled. Indeed, the instant case is perhaps clearer than the Bogert Case for here a contract defined the rights of the parties.

XIV. The final decree will, therefore, not contain any declaratory judgment as such, but it will carry costs and taxable disbursements to the plaintiffs and will provide:

(1) Restraining injunctions which will hold the situation in statu quo pending the rescission herein prescribed.

(2) A mandatory injunction whereby rescission of the transactions of 1935 and 1936, which North American forced on the Power Company, will be accomplished by having North American:

(a) Surrender the note of the Power Company dated April 1, 1935 in exchange for 2,000,000 shares of the Power Company's common stock.

(b) Surrender the note of the Power Company dated April 1, 1936 in exchange for 666,667 shares thereof, and,

(c) Repay to the Power Company all sums which it may have collected as interest on said notes or on the renewal or renewals thereof.

(3) An order retaining the jurisdiction of this Court in this cause so that it may hereafter modify, on the motion of either party, the provisions of the injunctions in the event that, under changed conditions or administrative rulings, they prove unfair. Cf. United States v. Swift & Co., 286 U.S. 106, 114, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999.

(4) The question as to whether it is proper for the Court to allow attorney's fees in favor of the plaintiffs in the Walters case (Equity 86—370) and against the North American Light & Power Company is reserved, to be also dealt with under the retained jurisdiction of this Court after the final determination of these causes.

XV. Under the decision of the United States Supreme Court on April 25, 1938 in Interstate Circuit, Inc., v. United States, 304 U.S. 55, 57, 58 S.Ct. 768, 769, 82 L.Ed. 1146, it is indicated that formal findings of fact and conclusions of law separately stated under Equity Rule 70½, 28 U.S.C.A. following section 723, must supersede any opinion in an equity case.

As the facts are stipulated, I think that the stipulation or stipulations of facts in each case may be properly incorporated by reference as the findings of facts therein. The conclusions of law will be in accordance with the foregoing opinion.

Such findings of fact and conclusions of law separately stated must be signed, and the costs and disbursements must be taxed before the final decree is submitted.

If the form of the findings and conclusions or of the final decrees cannot be agreed, they may be presented to me for settlement through the Clerk's office on three days notice.